STATE of Tennessee, Appellee,

v.

Thomas Edward ELLIOTT, a/k/a "Eddie" Elliott, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

Aug. 27, 1985.

Permission to Appeal Denied by Supreme Court Nov. 18, 1985.

W.J. Michael Cody, Atty. Gen. & Reporter, David M. Himmelreich, Asst. Atty. Gen., Nashville, Joseph Baugh, Jr., Dist. Atty. Gen., Franklin, for appellee.

Ernest W. Williams, David H. King, Franklin, for appellant.

## OPINION

O'BRIEN, Judge.

Defendant was convicted in the Williamson County Criminal Court of burglary, robbery, and aggravated rape. The court set respective sentences of fifteen (15) years each on the first two convictions and life imprisonment on the last, to be served

concurrently, but consecutive to a prior sentence for another offense.

By his first issue defendant asserts a violation of his Fourth Amendment right against an unreasonable search and seizure of articles of clothing from his home by virtue of an involuntary consent.

■ The sufficiency of the evidence is not challenged, however, a summary of the proof is essential to resolve the claim of a Fourth Amendment violation. During the early morning hours of January 22, 1983, a young woman was raped and robbed in her home in Franklin, Tennessee. She told investigating officers the perpetrator was a white male, slim built, with shoulder length dark hair, and a full beard; wearing a red, long sleeve, ribbed-type shirt or sweater without buttons, and a smooth-feeling jacket. He had an odor of alcohol about him and robbed her of a small sum of money which included a five dollar bill, a one dollar bill, and a quantity of change. She was not certain, but she thought her attacker may have been a man she knew as "Eddie" who lived in the neighborhood. From this description Detective Larry Barnes decided to question defendant. He and two other officers went to Elliott's home where some of his clothing was collected from the floor in his bedroom. Officer Barnes returned with the clothing to the victim's home. One of the other officers took defendant into custody for questioning. The victim identified a red thermal undershirt taken from defendant's room by its odor, texture and color as the one worn by her assailant. As the officers were examining defendant's blue jeans in the den of the victim's home a number of quarters, dimes and nickels were scattered about the floor. The trousers also contained a five dollar bill in one pocket, and four, one dollar bills in another. One dollar was separate from three others which were folded together. A guitar pick was found on the floor which, it was subsequently established, belonged to defendant. A pair of undershorts, or men's briefs, with defendant's name and prison serial number on them was found between the sheets on the victim's bed.

Defendant, through the testimony of several witnesses, presented an alibi defense. It was his theory that some of the evidence against him had been planted by one or more of the police officers.

Specifically, as it pertains to the first issue, the evidence shows that the officers went to defendant's home about 5:30 a.m. They were admitted by defendant's mother. Both he and his mother testified that he invited the officers to come into his bedroom. Defendant admitted he signed a "consent to search" form at Officer Barnes' request. The police found there, in plain view, the shirt identified by the victim as the one worn by her assailant. We note that the record does not include the transcript of the suppression hearing however, the trial record is replete with the evidence surrounding the seizing of defendant's clothing by the officers. Appellant argues that when the three police officers woke him telling him he was suspected in a rape case he had little choice but to cooperate and consent to a search. His own testimony refutes this contention. It appears the articles seized by the officers were in plain view in the room where they had been invited to go, and that a search, as such, was not necessary. If, in fact, a search had been initiated it would have been with defendant's full, voluntary and knowing consent. The issue is without merit.

■ Defendant insists the manner in which the police officers had the victim identify articles of his clothing was violative of his Fifth Amendment right.

The rape victim testified she was awakened by a noise coming from her kitchen area. As she raised up in bed she was able to see a figure coming toward her through the hallway. Before she could rise from the bed this person jumped on her. When she tried to call out he put his hand over her mouth, informed her he had a knife, and would kill her if she made any noise. He further said he had only come to rob her and if she cooperated he would do her no harm. He called himself a "nigger"

and said he was an escaped convict from New Mexico, that he had killed someone before, and it would make no difference if he killed another person.

This young woman had been a participant in a Rape Awareness Seminar arranged by her employer for the women employees. She testified that when it became apparent to her she was likely to be raped she tried to remember everything she should and should not do, one of which was to try to be calm and gather as much information as she could. Although the room was dark at first, and later he covered her head with a pillowcase, she was able to discern her assailant's approximate height when he was silhouetted against a window. She detected alcohol on his breath, and later noted that he also had a distinctive body odor. He seemed to be familiar with the layout of the house. He threatened several times to kill her or mutilate her, and hit her in the mouth when she prayed, then gagged her. He searched through the house for money and finally found her purse which contained a five dollar bill, a one dollar bill, and some change remaining from a visit to a laundromat. He made several forays through the house searching for valuables, becoming more agitated each time he returned to the bedroom. He kept repeating the story of his escape from prison but in one instance he told her he had escaped from Arizona rather than New Mexico. At one point during the ordeal she had occasion to touch the back of his hand and noticed it was hairy. She guessed he was caucasian rather than black because of the quantity of hair on his hand. While he was forcing her to engage in various sexual acts he turned the lights on. She was able to maneuver the pillowcase covering her eyes to the degree that at one time she could see his hand while he was manipulating her vaginal area and saw that it was white. She heard him unzip and remove his trousers and noted they sounded like "heavy blue jeans". She heard what she believed was his belt buckle hit the floor making a rather heavy sound. While he was in the process of raping her she felt one of his arms

and noted he was not very muscular. She felt his shirt and was able to describe the material as a ribbed shirt with the ribs very close together, similar to a sweater, and that it was not a tank top because she felt fairly long sleeves. She could see enough under her blindfold to note that it was a bright red color. She could also see that he had long dark hair and she could feel that he had a beard. After he departed and she had communicated with friends who came to her assistance, she recalled that the features she had identified about him reminded her of a man named Eddie who lived in the neighborhood, and who had been in her house on several occasions to discuss repair work. This description, which she gave to the police, enabled them to associate the name and description with defendant who lived a short distance away. When they returned with articles of clothing taken from his bedroom, the officers had the victim cover her eyes with her hand and feel the thermal underwear shirt. She identified the shirt by its texture and the odor which it emitted before she opened her eyes and further identified it by its color. It is to this procedure for identifying the clothing that defendant objects. He asks us to draw an analogy to an overly suggestive show-up identification of an individual. No authority is offered to support this theory, nor are we aware of any such. We decline to follow this suggestion. Before identifying the shirt as the one worn by her assailant, defendant had rejected another of defendant's shirts which the police presented to her in the same manner. She was thoroughly examined about her identification, the jury heard the evidence, and it was for them to make the determination of its reliability.

Defendant insists the clothing brought from his home to that of the victim was left unattended, exposed to tampering by her. After she identified his shirt in the presence of the officers and her friends the clothing was replaced in a paper bag and left on a table in the living room. The victim was taken to the hospital by Officer Barnes. At the same time all of the others

left. The only person remaining in the dwelling was Detective Mike Jordan who was assigned to make an investigation of the crime scene. He discovered defendant's undershorts marked with his name and prison identification number in the victim's bed. Defendant has advanced two theories. He suggests first that the shorts were planted in the bed by Detective Barnes, and alternatively that the clothing might have been tampered with in some fashion by the victim.

Whether or not the clothing was admissible in evidence was a discretionary matter for the trial judge to resolve. He found the evidence admissible. He was satisfied with the chain of possession, and we find nothing in this record to warrant disturbing his decision in the matter. Even in light of defense counsel's stringent cross-examination, there is not the first bit of evidence that anyone but Jordan ever went beyond the living room of the house or was anywhere near the victim's bedroom after Barnes returned with defendant's clothing. There was no constitutional violation in the manner in which the police handled the clothing evidence, or in its admission to the jury.

The next complaint deals with denial of a continuance. At least ninety (90) days prior to trial a motion was filed by the defense requesting disclosure of the names of any witnesses to be used by the State who had not been previously listed on the indictment in accordance with T.C.A. § 40-17-106. On the trial date the Assistant District Attorney General delivered to defense counsel, and filed with the court, a list of six additional witnesses whose names had not been endorsed on the indictment. Defense counsel requested, and was denied, a continuance in order for him to determine if it was necessary or possible to secure an expert witness to rebut the testimony of a State serologist who was one of the six witnesses not listed on the indictment. Defendant argues he was prejudiced by the late filing and that he was effectively precluded from conducting any background investigation on these witnesses, and from obtaining a defense expert to rebut the testimony of the State's expert. The prosecutor offered no explanation for the late filing and was strongly admonished by the trial judge that such conduct would inevitably result in a reversal if prejudice was established. We heartily endorse the trial judge's statement. Such conduct at best is foolhardy and at worst it is totally unprofessional to deliberately ignore the mandate of the statute. However, in this case, we agree with the trial judge that defendant was not prejudiced. Of the six witnesses whose names were not listed, two did not testify. Defense counsel was fully aware of the substance of the testimony of the serologist. He had been given a copy of the laboratory report earlier in response to a discovery request, and had talked with this witness prior to trial. There was no surprise in his testimony or the fact that he was to be called as a witness. The testimony of the other witnesses was either cumulative or corroborative. Two of these testified defendant had been at a party with them; one thought he left at 3:00 or 3:30 a.m., the other thought it was 1:30 or 2:00 a.m. Except for the variance in time, their testimony was corroborative of defendant's alibi witnesses. It is apparent from the record that the only surprise to the defense was that the witnesses were called. Under these circumstances we find no abuse of discretion in the denial of a continuance. *State v. Martin*, 634 S.W.2d 639, 643 (Tenn.Cr.App. 1982).

Much is made about the discovery and admission into evidence of a guitar pick found in the home of the victim. There is some evidence in the record that defendant was a musician and played the guitar. After the officers had gone to defendant's house and returned with some of his clothing Sergeant Barnes dumped some of the contents of defendant's pockets on the floor. The record is not clear whether this was inadvertent or intentional however, the notation in the State's brief that this occurred in the victim's bedroom is in error, the contents of the pants pockets were emptied on the floor of the den, and no-

where near the victim's bedroom. While the officers were picking up the change from the floor Lieutenant Smith observed the guitar pick. Sergeant Barnes packaged it and carried it off as part of the evidence. It proved to be totally irrelevant as evidence and its admission did not prejudice the defendant in any manner. Although the court allowed the evidence to go to the jury because defendant had denied owning the guitar pick, during his testimony he explained in detail why he had made that statement to the police.

■ Defendant complains of the order of proof and because the trial court limited his cross-examination of a police officer relative to an evidence list. Detective Jordan was assigned to collecting evidence at the home of the victim. In an internal police report he listed his activities in chronological order, indicating in the report the time as he progressed with his assignment. The report shows that Detective Barnes and Lieutenant Smith left the house between 5:15 and 5:30 to go to the home of defendant. At 5:50 Jordan began collecting evidence in the master bedroom where the assault occurred. The report contains the notation that about 6:15 or 6:30 the officer had begun removing the covers from the bed when he discovered the pair of men's shorts (briefs) under the top sheet. The shorts were marked with the name Elliott and a number which proved to be defendant's prison identification number. He immediately called Detective Barnes who was at the hospital with the victim.

In response to a pretrial discovery request defense counsel had received an evidence list of the items taken from the victim's residence. This list had been compiled by Officer Barnes sometime after all of the items had been collected, and defendant had been charged. The list included the notation that the shorts had been found in the bed at 5:34 a.m. When defense counsel became aware of the time discrepancy between Officer Jordan's report and Officer Barnes' evidence list, he sought to cross-examine Jordan about Barnes' report. The court would not allow this cross-exami-

nation but ruled that counsel might reserve cross-examination of Jordan pending direct examination of Barnes. The propriety, scope, manner and control of examination of witnesses is a matter within the discretion of a trial judge which will not be interfered with in the absence of abuse of discretion. See *Coffee v. State,* 216 S.W.2d 702, 703, 188 Tenn. 1 (1948), rehearing denied 1/17/49. *Hamilton v. State,* 555 S.W.2d 724, 731 (Tenn.Cr.App.1977). There was no abuse of discretion here, and no prejudice to the defendant. The issue of when and how the article of clothing was found in the victim's bed was fully developed. All of the evidence, including the police records, indicates that Barnes arrived at the defendant's residence at 5:29 a.m., and left there at approximately 5:40 a.m. It was an absolute impossibility for Barnes to have "planted" the shorts before he returned from defendant's house, or before defendant was ever identified as the rapist. There was an obvious error of time noted on the evidence list compiled by Barnes a day or two later. There was no error or denial of confrontation in limiting cross-examination of Jordan about a list which he had not prepared until after Barnes had testified.

■ Shortly after the police officers arrived at defendant's home one of them took a picture of him standing in his bedroom, clothed in only a pair of trousers. He argues the picture should not have been admitted into evidence because there was more prejudicial than probative value. We disagree. The rape victim had described her assailant including his physical characteristics, the length and color of his hair and beard at the time of the crime. The photograph fits the description given by the victim, and was highly relevant and material. See *State v. Banks,* 564 S.W.2d 947 (Tenn.1978). The issue is overruled.

■ Defendant also complains of the prosecutor's comments upon introduction of this photo into evidence. Defense counsel had called for a "side-bar conference", out of the jury's hearing, to obtain a ruling on the photograph's admissibility. Mo-

ments later the Assistant District Attorney General offered the evidence, "subject to the defense's objections to it". Defense counsel objected to the comments and moved for a mistrial. The comment was superfluous, and certainly improper, if it was intentional it was highly unethical. It is elementary knowledge to every practicing attorney that matters discussed in jury-out hearings are not to be commented upon before the jury. The motion for mistrial was overruled and the trial judge remonstrated with counsel about the comments. We have reviewed this trial error in the light of the criteria set out in *Judge v. State*, 539 S.W.2d 340 (Tenn.Cr.App.1976) and conclude the error was harmless in the light of the unimpeachable evidence of defendant's guilt found in this record. The line between harmless and prejudicial error was not breached in this instance.

◼ We find no merit to defendant's claim that his constitutional right to a fair trial was violated by introduction of evidence of the identity of fingerprints developed at the crime scene as those of the victim. In the course of their investigation the police lifted various fingerprints throughout the victim's dwelling and sent them to the crime laboratory for identification. It was ascertained that none of the fingerprints found could be matched with those of the defendant. During trial defense counsel endeavored to convey to the jury that these unidentified prints could have been made by an assailant who was not the defendant. Subsequently the State had the latent prints compared with those of the victim and it was determined that prints on a pantyhose box were hers. While it may have shown a lack of trial preparation by the State's failure to make this comparison beforehand, there was certainly nothing improper in their developing this evidence when it became essential to an ascertainment of truth in the course of the trial. It was no more unfair for the State to show this to be the victim's fingerprint than it was for the defendant to suggest by innuendo that the print could have been that of a third party.

◼ Defendant says he was entitled to a mistrial when the State initiated cross-examination into details of a previous burglary conviction.

In a jury-out hearing the trial court determined that the fact of a prior burglary conviction of defendant would be admissible for purposes of impeaching his credibility. On direct examination defendant admitted his previous conviction. On cross-examination the prosecuting attorney began to inquire into the circumstances of the offense. The trial court sustained defendant's objection but denied a mistrial. At defendant's request he instructed the jury to disregard any reference to the details of defendant's previous conviction and informed them that it could be considered only to the extent that it reflected on the credibility of the witness, but not otherwise. The inquiry into the details of defendant's prior conviction was an absolute violation of the rule adopted by our Supreme Court in *State v. Morgan*, 541 S.W.2d 385, 388 (Tenn.1976). The rule has been repeated so frequently in the interval since the publication of *Morgan* that it should be indelibly printed in the mind of every prosecuting attorney:

> "Inquiry.... '[Must] be limited to the fact of a former conviction and of what crime, with the object only of affecting the credibility of the witness, not prejudicing the minds of the jury as to the guilt of the defendant witness of the crime for which he is on trial.'"

In light of the brevity of the State's inquiry, coupled with the thorough and comprehensive instruction by the trial judge to the jury, and in view of the overwhelming evidence against the defendant we do not find that the error affected the judgment or resulted in prejudice to the judicial process. T.R.A.P. 36.

◼ Defendant insists that evidence relating to a polygraph test to which he submitted should have been admitted into evidence. This Court has repeatedly held that the results of a lie detector test are inadmissible into evidence, and that the circum-

stances surrounding the taking or not taking of such a test are likewise inadmissible. *Hembree v. State*, 546 S.W.2d 235, 240 (Tenn.Cr.App.1976); *State v. Plummer*, 658 S.W.2d 141, 143 (Tenn.Cr.App.1983).

The most serious issue raised is the court's denial of cross-examination of Detective Sergeant Barnes about specific instances of conduct for the purpose of attacking his credibility. Particularly defense counsel desired to question him about a prior civil rights judgment against him charging a conspiracy with a third person to bring armed robbery charges against the plaintiffs in the civil suit, and about his suspension from the police department for purportedly obstructing the issuance of two arrest warrants.

The trial judge denied cross-examination on the first question because it related to a civil judgment, was not applicable under the procedure for testing the credibility of a witness in this State, and had no probative value. It was his opinion the civil rights judgment could have been for any number of things that would have no relation to the type of case at trial. On the second question the witness answered that he had been suspended for violating department codes. The trial judge ruled that counsel was bound by the answer. He further ruled that counsel could ask about any bad act involving moral turpitude but that the examiner would be bound by the answer of the witness. He remarked in the course of his ruling that he never had "known what moral turpitude was and neither have the courts". When counsel asked if he might be heard for the purposes of the record the court commented to the effect that it was flattery to believe "the appellate courts read our statements for the record"; either that of court or counsel. We trust we have disabused his Honor of that misconception.

In *State v. Morgan*, supra at p. 387, the court, after reviewing the various prior cases dealing with the scope of cross-examination on the issue of credibility of a criminal defendant who elects to testify in his own behalf, stated that the moral turpitude standard, applied to convictions or to specific acts, offenses and charges, was a source of much disagreement which had created difficulty for the courts in determining whether a specific crime involved moral turpitude and might be used for impeachment. As a result the Federal Rules of Evidence were adopted to achieve a degree of consistency, fairness and justice which would better serve the quest for truth. In reference to specific instances of conduct other than convictions of crime the court ruled as follows:

> "We further hold that where a witness is sought to be cross-examined as to specific instances of conduct as contemplated by Rule 608(b), the Court shall conduct a jury-out hearing for the purpose of determining that the probative value of such evidence outweighs its prejudicial effect. When such cross-examination is permitted the answer of the witness shall be conclusive......".

In this case the stated defense was that the police department, or at least one of its members, had planted evidence, specifically referring to defendant's undershorts, in the victim's bed. By cross-examining Officer Barnes on the questions raised, the intent was to reflect on Barnes' character for truthfulness.

The court held the required hearing set out in *Morgan* which leaves it to his discretion to allow inquiry on cross-examination of the witness about specific instances of conduct if he finds the inquiry probative of truthfulness or untruthfulness. It was his conclusion that the requested cross-examination was not probative of these traits. We do not, under the facts of this case, find any reason to rule otherwise.

The defendant testified that, as the result of an earlier altercation between him and Barnes, that the officer bore a personal grudge against him, and he did not know how his underwear could have gotten into the victim's bed unless it was planted by Barnes. There is not a scrap of evidence in this record to support this theory. The

time related in Barnes' evidence list (5:34 a.m.) that the undershorts were discovered is stressed heavily. This hour was a chronological impossibility and obviously an erroneous entry. At that hour Barnes had not yet returned from defendant's residence. There is no evidence that the officer picked up more than one pair of shorts in defendant's bedroom. There were two police officers besides Barnes, the victim and three friends who had come to her assistance, all present when Barnes brought defendant's clothing to the victim's home for her identification. There is no evidence that he ever went into or near the bedroom where defendant's undershorts were found. Under these circumstances neither the brevity of the jury-out hearing nor the decision of the trial judge to deny cross-examination of the officer on the subject of the civil judgment against him or his temporary suspension from duty warrants a finding of abuse of discretion on his part.

■ Defendant submitted several special requests for jury instructions which the trial court declined to deliver. This is now assessed as error. These instructions related to the possibility of the "planting" of evidence at the scene of the crime, and on the identification of defendant as the offender. It is the duty of the trial judge to give a complete charge of the law as applicable to the facts of the case, and a defendant has the right to have every issue of fact raised by the evidence and material to his defense submitted to the jury in proper instructions by the judge. *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). This does not mean every defense theory must be charged. Full and complete instructions to the jury were delivered on every issue in evidence. Defendant was entitled to no more.

We find the record free of reversible error and affirm the judgment of the trial court.

DWYER and BYERS, JJ., concur.