IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 5, 2012

**STATE OF TENNESSEE v. KENNETH LEWIS**

**Appeal from the Criminal Court for Shelby County**
**No. 09-00033    J. Robert Carter, Jr., Judge**

_____

**No. W2011-02219-CCA-R3-CD  - Filed May 13, 2013**

_____

The Defendant-Appellant, Kenneth Lewis, was indicted by a Shelby County Grand Jury for second degree murder, a Class A felony, and was convicted as charged. See T.C.A. § 39-13-210 (2006).  The trial court sentenced Lewis as a Range II, multiple offender to a sentence of thirty-five years at one hundred percent release eligibility.  On appeal, Lewis argues:  (1) the evidence is insufficient to sustain his conviction; (2) the trial court abused its discretion in denying his request to question a witness about the witness's failure to appear at two prior court proceedings in his case; and (3) his sentence is excessive.  Upon review, we affirm the judgment of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Jeff Woods, Memphis, Tennessee, for the Defendant-Appellant, Kenneth Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Michael R. McCusker, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

 **Trial.**  Helen Traylor, the sister of the victim, James Mosby, testified that the victim had been diagnosed with schizophrenia and had lived with their mother, his caregiver, prior to his death.  Traylor was not aware of the victim using or selling drugs during his lifetime.  She said that prior to the attack, the victim weighed approximately 120 pounds and was five feet, seven or eight inches tall.

Traylor stated that she and her mother filed a missing persons report for the victim after they had not seen or heard from him for several days. In addition, they posted flyers with pictures of the victim around their neighborhood. After talking to some employees at the M and M Express convenience store, Traylor and her mother began looking for the victim at the local hospitals and eventually found him at the Regional Medical Center at Memphis. Prior to their arrival at that hospital, the victim was known only as "John Doe." Traylor said that when she first saw her brother after the attack, she noticed that he had "stitches across his head and . . . was swollen. He didn't look like himself." She said that her brother never regained consciousness following his attack and that in March 2007, the hospital transferred him to St. Peter's Villa, a nursing home, where he stayed for several months until his death. She stated that her brother's condition never improved.

Abbas Alkubechy, a manager at the M and M Express convenience store, stated that he was working at the store the night the victim was attacked. Alkubechy said he had known Lewis for eleven years at the time of the attack and also knew the victim. He remembered Lewis coming into the store with his car title and asking him for a twenty-dollar loan, which he refused to give him. Alkubechy turned to look at the security television, which showed live footage from the security cameras, and saw Lewis leaving the store as the victim walked into the store's parking lot and faced Lewis. Alkubechy explained that although he was able to view the live security footage, this footage was not recorded. Alkubechy then saw "a black guy with a white jumpsuit" take Lewis's bicycle and ride away from the store. At that point, he stopped looking at the security camera footage because he had to help a customer. Once he finished assisting the customer, he looked back at the security footage and saw Lewis hit the victim, which caused the victim to fall, and heard someone, probably Lewis, yelling. Alkubechy immediately ran outside and when he saw Lewis stomping on the victim's head, he told Lewis to stop hurting the victim. At the time, he saw "thick blood" seeping out of the victim's head and noticed that the victim was breathing heavily. Lewis left the victim and entered the store, where he stole a can of beer and told Alkubechy that he could call the police. Alkubechy called 9-1-1 and gave the dispatcher a description of Lewis. He said that the victim was unresponsive when the police arrived on the scene.

On cross-examination, Alkubechy said that Lewis came to the store two times that night. He said the first time Lewis came into the store he bought a six-pack of Corona Light and asked for the twenty-dollar loan in exchange for his car title. He said the the second time Lewis came into the store was when Lewis attacked the victim.

Howard Catron testified that he stopped at the M and M Express convenience store close to midnight on March 6, 2007, and saw several people standing outside. As Catron was about to buy some gasoline, he saw a man, later identified as Lewis, ride into the store's parking lot on a bicycle and park it near two men, an "older guy," later identified as the

-2-

victim, and a "younger guy." When Lewis went inside the store, the younger guy stole the bicycle and rode away. At that point, the victim approached Catron and asked for some change. Catron said that when Lewis exited the store, he noticed that his bicycle had been stolen, and he became angry. Lewis asked the victim if he had stolen it, and when the victim told him that he had not taken it, Lewis hit the victim until he fell to the ground. He said Lewis began to "stomp [the victim] with his feet." Catron said Lewis continued to stomp the victim with both feet until the victim lay "motionless on the ground." At that point, Lewis asked Catron if he had "something to do with his bike getting stolen[,]" and Catron denied that he was involved. As Catron was leaving the store, Lewis began to hit the victim again" and heard Lewis tell the victim that he knew the victim had stolen his bicycle. He then heard Lewis tell the victim: "[Y]ou still alive? I'm going to kill you now. I'm going to kill you now." Before Catron left the store, he saw Lewis stomping the victim again. Catron left the store and went to work, where he was told to leave because he had gotten to work too late. When he returned from work, he saw police cars and an ambulance in front of the convenience store. He stopped at the store and identified Lewis as the victim's attacker for the police.

On cross-examination, Catron admitted that he never mentioned in his statement to police that Lewis stomped on the victim with both feet. He also admitted that he never called the police about the attack.

Brian Moore, an officer with the Memphis Police Department, testified that he responded to the scene in the early morning hours of March 7, 2007, after dispatch notified him that an assault had taken place. When he arrived at the scene, Officer Moore saw the victim lying on the ground and bleeding from his head. He stated that the victim was unresponsive. Officer Moore said he developed Lewis as a suspect because the store's employee was able to give him a description of the victim's attacker.

Cedric Claxton, another officer with the Memphis Police Department, testified that he located Lewis, who matched the description of the attacker, approximately one block away from the store. Officer Claxton stated that he placed Lewis in custody and took him to the store, where Alkubechy identified him as the victim's attacker. At his lieutenant's request, he checked Lewis's shoes, which had blood on the bottom of them. Officer Claxton said Lewis was transported to the felony response unit at 201 Poplar, where he became agitated, uncooperative, and loud. He stated that Lewis had no injuries at the time of his arrest.

David Galloway, a crime scene officer with the Memphis Police Department, testified that he made photographs of Lewis's clothing and shoes. Officer Galloway said he collected Lewis's shoes, so that the blood on them could be tested for DNA.

Degrah Bell, an officer with the felony response unit of the Memphis Police Department, testified that she was at the scene when Lewis was taken into custody. Officer Bell stated that when Lewis was brought to the felony response unit, he became "very agitated, very excited, really belligerent." She stated that because Lewis appeared to be under the influence of an intoxicant, he was taken to the Regional Medical Center at Memphis.

Olevia Becton, a registered nurse at St. Peter's Villa nursing home, testified that she took care of the victim at the nursing home. She stated that the victim was "in a vegetative state" from the time that he arrived at St. Peter's Villa until he passed away on November 17, 2008.

Affidavits regarding the victim's medical records were obtained from the custodian of records for the Regional Medical Center at Memphis and St. Peter's Villa nursing home. These medical records were entered into evidence by agreement of the parties.

Dr. Karen Chancellor, the Shelby County Chief Medical Examiner, testified that she performed the victim's autopsy on November 18, 2008. She stated that the victim's cause of death was complications of blunt force injury to the head and that the victim's manner of death was homicide. During the autopsy, Dr. Chancellor noticed that the victim's body was in a contracted state, which indicated that the victim had not moved or been moved recently and was unable to care for himself. She also noticed that the victim was wearing a diaper, had a tracheotomy tube to assist with his breathing, and had a feeding tube because he was unable to feed himself. In addition, Dr. Chancellor observed a scar, two and a half inches in length, on the victim's forehead and stated that this injury had been noted by the hospital at the time he was admitted. Dr. Chancellor opined that the victim had sustained "damage to all parts of the brain" and that the condition of the victim's brain was consistent with traumatic brain injury.

Qadriyyah Debnam, a former forensic scientist with the Tennessee Bureau of Investigation, testified that she tested the DNA obtained from the bottom of Lewis's shoes while working as a special agent in the serology unit. Debnam stated that this blood matched the victim's DNA. She also stated that the blood from the crime scene matched the victim's DNA.

Lewis, the Defendant-Appellant, testified in his own behalf. He admitted that he had two felony convictions for robbery and aggravated burglary and had three misdemeanor convictions for theft. Lewis stated that he had learned of his uncle's death the day of the victim's attack. He said he went to his mother's house around 11:30 a.m. to spend time with his family and drank around "five 40 ounces" of beer. Sometime after 10:00 p.m., Lewis

decided to leave his mother's house. Because he had locked his keys inside his car, Lewis took his stepfather's bicycle to the M and M Express convenience store. Lewis stated that he did not want to borrow his stepfather's truck because they did not get along.

Lewis said that before he left his mother's house, he smoked two "primos," which he described as "crack cocaine crushed down and mixed with weed[.]" He rode the bicycle to the convenience store to buy a cigar, so that he could use the cigar paper to make another "primo." When he got to the store, he bought a cigar and a six-pack of Corona Light. He immediately exited the store, made the "primo," and lit it because he was in a hurry to get high. At that point, the victim and another man, nicknamed "Slick," approached him for the purpose of buying drugs. Lewis gave the two men some crack cocaine for free, and the victim "pulled out [a] crack pipe," which he and "Slick" used to smoke the crack cocaine. Lewis said he stood in the parking lot with the two men for approximately ten minutes.

Lewis then left the store and rode the bicycle back to his mother's house. A short time later, he decided he wanted to smoke another "primo," so he returned to the store some time around midnight to buy another cigar. When he arrived at the store the second time, the victim and "Slick" were still standing outside the store. The victim asked to buy more drugs, and Lewis lied and told him that he did not have any more drugs. Lewis left his bicycle beside the two men and entered the store, where he bought another cigar. He said he was in the store for four to five minutes because he was talking to Alkubechy. When he exited the store, he saw that his stepfather's bicycle had been stolen and he got "mad and upset." Lewis said that the victim approached him and informed him that he would have to pay ten dollars to get the bicycle back. Lewis refused and slapped the victim "with an open hand." Then the victim hit him in the face, and he hit the victim a second time with his left closed fist, which caused the victim to fall on the ground and to hit his head on the concrete curb. Lewis admitted that he kicked the victim after he fell to the ground. He said he never believed that he could kill someone by kicking them and that he was "sorry." Lewis said that after he kicked the victim, the victim began "snoring" as if he were asleep. He thought that the victim was "just knocked out" and would eventually awaken. Lewis admitted telling the victim that he "better be lucky [he was] still breathing because [he] ought to kill [him]."

On cross-examination, Lewis acknowledged that he kicked the victim because he "was full of a lot of emotions at the time" and was upset that the victim and "Slick" would "take [his] kindness for weakness [after he had] just [given] them [crack cocaine] and [had] told them they could keep the change." He admitted that he was addicted to crack cocaine and had smoked two "primos" before going to the store the first time. He also admitted that he had previously stolen items to support his crack cocaine habit. Lewis said that during the fight with the victim, his primary objective was to get the bicycle back. He said, "I would never try to kill nobody. Death was not on my mind at all, period." When the State noted

the disparity in Catron's version and Lewis's version of the attack and asked Lewis if he agreed that Catron had no reason to lie about what happened the night of the attack, Lewis replied, "But [Catron] left the lot." Then Lewis stated, "[H]ow do I know that [Catron] didn't buy my bike" from the victim and "Slick." Then Lewis mentioned Catron's failure to appear at his last trial, which caused the State to object, and the trial court instructed Lewis to answer the questions posed by the State. Lewis said that Catron was laughing during his fight with the victim, which is why he asked Catron if he had something to do with the missing bicycle.

**Sentencing Hearing.** At the August 11, 2011 sentencing hearing, the State entered a copy of the presentence investigation report and a letter from Helen Traylor, the victim's sister, into evidence. Both of these documents were admitted without objection from the defense.

Lewis's prior convictions were established through the testimony of Vicki Davis, the keeper of records in the Criminal Court Clerk's Office, the presentence investigation report, and certified copies of the convictions from General Sessions Court, all of which showed that Lewis's extensive criminal history included the following convictions:

| Date of Conviction | Conviction Offense | Sentence |
|---|---|---|
| 2/8/2006 | Disorderly Conduct | 30 days |
| 2/8/2006 | Vandalism | 60 days |
| 10/6/2005 | Robbery | 3 years suspended to probation |
| 3/16/2005 | Criminal Trespass | 4 days |
| 3/2/2005 | Theft of Property under $500 | 2 days |
| 7/10/2003 | Probation Violation | 60 days |
| 6/3/2002 | Aggravated Burglary | 3 years suspended to probation |
| 5/14/2002 | Driving Under the Influence of an Intoxicant | 11 months, 29 days, suspended to probation for 10 months, 29 days |
| 5/14/2002 | Assault | 30 days |

| | | |
|---|---|---|
| 5/14/2002 | Vandalism | 30 days |
| 5/8/2000 | Driving with License Suspended/Cancelled/Revoked | 5 days |
| 5/8/2000 | Disorderly Conduct | 3 days |
| 5/7/2002 | Theft of Property less than $500 | 27 days |
| 4/10/2000 | Assault | 6 months, which was suspended and probation for 11 months, 29 days |
| 4/5/2000 | Vandalism | 5 months |
| 4/5/2000 | Vandalism | 5 months |
| 4/5/2000 | Violation of Probation | 60 days |
| 7/15/1999 | Driving with a Revoked License | 11 months, 29 days suspended to probation |
| 7/15/1999 | Driving While License Suspended | 11 months, 29 days suspended to probation |
| 4/1/1999 | Assault | 180 days suspended |
| 7/14/1997 | Aggravated Criminal Trespass | 30 days |
| 7/14/1997 | Resisting Official Detention | $50 fine |
| 2/21/1997 | Probation Violation | Not Stated in Record |
| 2/21/1997 | Disorderly Conduct | 4 days |
| 2/21/1997 | Assault | 10 days |
| 12/16/1996 | Criminal Trespass | 20 days |

In the presentence investigation report, Lewis disclosed that he began drinking alcohol at age twelve and began smoking marijuana at age thirteen. He also disclosed that he

typically smoked three marijuana "blunts" a day. Lewis stated that he began using powder cocaine at age nineteen, and regularly consumed two grams of cocaine a day, before switching to crack cocaine at age twenty-six.

After hearing arguments from counsel, the trial court determined that Lewis was a Range II, multiple offender because he had been convicted of two Class C felonies, aggravated burglary and robbery, which were within two classes of his conviction for second degree murder. Id. § 40-35-106(a)(1) (2006). The trial court also stated that Lewis faced a range of twenty-five to forty years at one hundred percent release eligibility. Id. §§ 40-35-112(b)(1), -501(i)(1), -501(i)(2)(B) (2006).

Although defense counsel argued for the application of several mitigating factors, the trial court only applied mitigation factor (13) because "there was an element of remorse in Mr. Lewis's testimony and [his] remorse was in a great amount for his own situation for his own self, but I do feel like there was genuine remorse for the fact that the victim . . . was in fact dead so I give him some credit for that." Id. §40-35-113(13) (2006). Regarding the enhancement factors, the trial court found that Lewis had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]" Id. § 40-35-114(1) (2006). He placed particular emphasis on the fact that Lewis had been convicted of "multiple assault convictions." The court stated, "I have an individual with a lengthy history of violent behavior with multiple convictions for assault and that assaultive behavior is something that I have to consider and that is an enhancement of the sentence within the appropriate range." The court gave only "some weight" to the enhancement factor that the victim "was particularly vulnerable because of age or physical or mental disability[.] Id. § 40-35-114(4) (2006). The court acknowledged that the victim had "challenges as a result of [his health issues], but I do not find that he was helpless."

At the conclusion of the hearing, the trial court sentenced Lewis as a Range II, multiple offender to thirty-five years at one hundred percent release eligibility. Lewis filed a timely motion for new trial, which was denied by the trial court. He then filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** Lewis argues that the evidence is insufficient to support his conviction for second degree murder. Specifically, he asserts that the evidence is sufficient to support a conviction for manslaughter, rather than second degree murder, because the proof showed that he became enraged and attacked the victim when he discovered that his stepfather's bicycle had been stolen. He also asserts that the State improperly relies on the brutality of the offense to establish his guilt under the second degree

murder statute because the nature of the conduct and the manner of the victim's death are inconsequential under this statute. See State v. Parker, 350 S.W.3d 883, 904 (Tenn. 2011). The State responds that the evidence is sufficient to sustain the second degree murder conviction because the proof established that Lewis attacked and killed the victim for stealing his stepfather's bicycle. We agree that the evidence is sufficient to sustain Lewis's conviction.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Lewis was convicted of second degree murder, which is defined as "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). In order to establish this offense, the State must prove beyond a reasonable doubt that "(1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." Parker, 350 S.W.3d at 904.

Regarding the first element, whether Lewis killed the victim, Dr. Chancellor testified that the victim died of complications from blunt force injury to the head. She stated that the victim had sustained "damage to all parts of the brain" and that the condition of the victim's

brain was consistent with traumatic brain injury. Alkubechy and Catron testified that they saw Lewis stomping on the victim. Catron stated that the victim eventually lay motionless on the parking lot as a result of Lewis's conduct. Officer Moore testified that the victim remained unresponsive at the scene, Traylor testified that the victim never regained consciousness, and Becton testified that the victim was "in a vegetative state" from the time that he arrived at St. Peter's Villa until he passed away on November 17, 2008. At the time of his arrest, Lewis had blood, matching that of the victim, on the soles of his shoes. This evidence, taken in the light most favorable to the State, is sufficient to establish that Lewis caused the lethal injuries to the victim. Accordingly, we conclude that the evidence is sufficient to prove the first element of second degree murder.

We now must determine whether the evidence is sufficient to prove the second element, whether Lewis committed the killing with a "knowing" state of mind. Tennessee Code Annotated section 39-11-302(b) (2006) defines the term "knowing":

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The Tennessee Supreme Court has provided guidance in determining whether a defendant "knowingly" kills a victim:

> Because this Court has determined that "[s]econd degree murder is a result of conduct offense," State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010), "[t]he 'nature of the conduct' that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, the proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused "knew that his or her actions were reasonably certain to cause the victim's death." Brown, 311 S.W.3d at 432.

Parker, 350 S.W.3d at 904.

We also conclude that there is sufficient evidence to prove that Lewis "knowingly" killed the victim. Alkubechy and Catron testified that Lewis repeatedly stomped on the victim. Catron testified that after stomping the victim's head, Lewis told the victim: "[Y]ou

still alive? I'm going to kill you now. I'm going to kill you now." Catron also stated that the victim lay "motionless" on the parking lot following the attack. Lewis admitted that when the victim approached him and told him he would have to pay ten dollars to get the bicycle back, he slapped the victim "with an open hand." He said that when the victim hit him in the face, he hit the victim a second time with his left closed fist, causing the victim to fall on the ground and to hit his head on the concrete curb. Lewis also admitted that he kicked the victim after the victim fell to the ground. Given this evidence, it was reasonable for the jury to infer that Lewis knew his conduct toward the victim was "reasonably certain" to cause the victim's death.

Although several different versions of the victim's attack were presented at trial, it was the jury's duty to evaluate the credibility of witnesses, to determine the weight given to testimony, and to resolve all conflicts in the evidence. See Odom, 928 S.W.2d at 23. For this reason, we will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Because there is sufficient evidence in the record establishing that Lewis killed the victim and that he committed the killing with a "knowing" state of mind, the proof is sufficient to sustain Lewis's conviction for second degree murder.

**II. Denial of Request to Question Witness.** Lewis argues that the trial court's denial of his request to question Howard Catron about his failure to appear at two prior court proceedings in his case violated the Confrontation Clause and constituted reversible error because he "was denied the opportunity to explore possible motive or bias on the part of the witness." The State responds that the trial court did not abuse its discretion in denying this request because Lewis failed to show how Catron was biased toward the prosecution. The State asserts that Lewis alleged no actual bias or motive on the part of Catron and that "[a]t most, Catron's failure to appear at a prior hearing demonstrates a reluctance to be a State's witness, not a motivation to be one." Finally, the State contends that no violation of the Confrontation Clause occurred because Lewis had an opportunity to cross-examine Catron about his credibility as an eyewitness to the victim's attack. We conclude that Lewis has waived this issue for failing to make an offer of proof.

The defendant has a fundamental right to examine a witness for bias. State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). This right "includes the right to examine a witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness." Rice, 184 S.W.3d at 670; Sayles, 49 S.W.3d at 279 (citing State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993)). Any undue restrictions of this right may violate the Confrontation Clause of the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Rice, 184

S.W.3d at 670 (citing <u>Smith</u>, 893 S.W.2d at 924; <u>State v. Black</u>, 815 S.W.2d 166, 177 (Tenn. 1991)).

The Tennessee Supreme Court outlined the elements a defendant must show in order to prove a violation of the Confrontation Clause:

> "[A] criminal defendant states a violation of the [federal] Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." <u>Delaware v. Van Arsdall</u>, 475 U.S. at 680, 106 S.Ct. at 1436; <u>see also</u> <u>Olden v. Kentucky</u>, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). The defendant must show that a reasonable jury might have received a significantly different impression of the witness's credibility had counsel been permitted to pursue his proposed line of cross-examination. <u>Delaware v. Van Arsdall</u>, 475 U.S. at 680, 106 S.Ct. at 1436.

<u>Black</u>, 815 S.W.2d at 177. "The exposure of a witness's motivation in testifying is a proper and important function of cross-examination." <u>Sayles</u>, 49 S.W.3d at 279 (citing <u>Van Arsdall</u>, 475 U.S. at 678-79). However, "[t]he propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion." <u>State v. Harris</u>, 839 S.W.2d 54, 72 (Tenn. 1992) (citing <u>Edwards v. State</u>, 424 S.W.2d 783, 786 (Tenn. 1968); <u>State v. Elliott</u>, 703 S.W.2d 171, 176 (Tenn. Crim. App. 1985)).

Tennessee Rule of Evidence 103 specifically discusses a trial court's error regarding the admission or exclusion of evidence. Rule 103(a)(2) states, in pertinent part:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
>
> . . . .
>
> (2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

Tenn. R. Evid. 103(a)(2). This rule requires a party seeking admission of the evidence to make an offer of proof unless the substance of the evidence and the evidentiary basis

supporting the evidence's admission is apparent under the circumstances. Id. The Tennessee Supreme Court has routinely held that the failure to make an offer of proof following a trial court's exclusion of evidence results in waiver of the issue on appeal. State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001) (concluding that the failure to make an offer of proof regarding excluded evidence results in a waiver of the issue); State v. Goad, 707 S.W.2d 846, 852-53 (Tenn. 1986) (holding that "[i]n order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record" and that when the excluded evidence "consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible").

Here, at the end of the State's direct examination of Catron, defense counsel requested a bench conference, wherein counsel and the court had the following exchange:

| [Defense Counsel]: | Your Honor, I would like to get [Catron] to (indiscernible) the witness– |
|---|---|
| [The State]: | I object to that, Your Honor. That's not relevant. |
| The Court: | What would the relevance of that be? He's now been served. He's here. He's testified. I mean, how is that relevant? |
| [Defendant Counsel]: | I mean, I think it goes to (indiscernible)– |
| The Court: | Well[,] I don't know that that's true. I know that we don't have service on him and I issued a material witness warrant and it was served on him. But, I mean, I don't know where he's been. |
| [The State]: | Neither does the State. |
| The Court: | I mean, if you know that to be the case, then I guess arguably it could be, but all I know is he is like many other witnesses, he didn't get served until this time, you know. |
| [The State]: | It's a fishing expedition to impeach the witness. |
| [Defense Counsel]: | Okay. |

The record shows that Lewis failed to make an offer of proof regarding Catron's potential bias toward the prosecution. See Tenn. R. Evid 103(a)(3); Sims, 45 S.W.3d at 15; Goad, 707 S.W.2d at 853. Because the substance of the evidence regarding Catron's alleged bias is not apparent from the record, we conclude that Lewis has waived this issue. See id.

**III.  Sentencing.**  Lewis argues that the trial court improperly considered Helen Traylor's victim impact statement as an enhancement factor and failed to consider any mitigating factors, including the factor that he acted under strong provocation, prior to imposing his sentence. See T.C.A. § 40-13-113(2) (2006).  The State responds that Lewis has waived the issue regarding the victim impact statement because he failed to contemporaneously object to the admission of the statement. See Tenn. R. App. P. 36(a). The State also argues that Lewis is not entitled to relief from his sentence because the trial court imposed a sentence within the appropriate range of punishment for the offense and placed the reasons, which were consistent with the purposes and principles of the sentencing act, on the record.  We agree with the State.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2006).  The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d) (2006), Sentencing Comm'n Comments.

Because of the broad discretion given to trial courts by the 2005 amendments to the sentencing act, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012).  Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id.

-14-

"So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, Lewis has failed to establish that the trial court abused its discretion in sentencing him to thirty-five years in confinement.

First, Lewis argues that the trial court improperly considered the victim impact statement as an enhancement factor. Here, Lewis failed to contemporaneously object to the victim impact statement submitted by the victim's sister, Helen Traylor. We note that this court is not required to grant relief when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." See Tenn. R. App. P. 36(a). Moreover, a party typically waives review of the trial court's admission of evidence if that party fails to make a contemporaneous objection. See State v. Reid, 213 S.W.3d 792, 847 (Tenn. 2006) (citations omitted); State v. Thornton, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999) (citing Tenn. R. App. P. 36(a)). Waiver notwithstanding, we note that pursuant to Tennessee Code Annotated section 40-38-207 of the Victim Impact Statement Act, any victim impact statement shall be considered as evidence in determining whether mitigating and enhancement factors apply. In addition, "[w]henever victim impact information contains relevant and reliable evidence relating to enhancing or mitigating factors and/or any other sentencing consideration, the trial court should consider it and determine what weight, if any, should be given to that evidence." State v. Ring, 56 S.W.3d 577, 583 (Tenn. Crim. App. 2001). Therefore, if the trial court used the victim impact statement to determine whether the enhancement factors applied in this case or for any other sentencing consideration, such use was proper. Accordingly, Lewis is not entitled to relief on this issue.

Second, Lewis argues that the trial court erred in failing to consider any mitigating factors prior to imposing his sentence. The transcript from the sentencing hearing shows that defense counsel argued for the trial court's application of the following mitigating factors: that Lewis "acted under strong provocation[,]" that "[s]ubstantial grounds exist[ed] tending to excuse or justify [his] criminal conduct, though failing to establish a defense[,]" and that he showed remorse. See T.C.A. §§ 40-35-113(2), (3), (13) (2006). Although the record shows that the trial court considered the requested mitigating factors, the court chose to apply only the mitigating factor regarding remorse. Therefore, despite Lewis's arguments to the contrary, the record shows that he benefitted from the application of the mitigating factor

-15-

regarding his remorse. Moreover, upon review, we conclude that the record does not support the application of any mitigating factors other than the factor regarding Lewis's remorse.

The trial court's oral sentencing findings show that it thoroughly considered the purposes and principles of the sentencing act before imposing Lewis's sentence. The court properly determined that Lewis was a Range II, multiple offender based on his extensive criminal history. After applying the mitigating factor regarding Lewis's remorse, the court applied the enhancement factor regarding Lewis's criminal history and gave some weight to the enhancement factor regarding the victim's vulnerability. It then sentenced Lewis to thirty-five years, five years less than the maximum sentence in the range for the offense of second degree murder. We conclude that the trial court did not abuse its discretion in imposing a sentence of thirty-five years in Lewis's case.

Because the trial court sentenced Lewis within the appropriate range, considered the purposes and principles of the sentencing act, and considered the appropriate enhancement and mitigating factors, we uphold Lewis's sentence of thirty-five years. See Bise, 380 S.W.3d at 706-07. The trial court's judgment is affirmed.

## CONCLUSION

Upon review, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE