# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 10, 2013 Session

## STATE OF TENNESSEE v. DANNY OWENS

**Appeal from the Circuit Court for Lawrence County**
**No. 29219      Robert Lee Holloway, Jr., Judge**

---

**No. M2012-02717-CCA-R3-CD - Filed March 24, 2014**

---

The Defendant-Appellant, Danny Owens, was indicted by a Lawrence County Grand Jury for the first degree premeditated murder of his wife. At trial, Owens was convicted of second degree murder. The trial court sentenced Owens as a Range I, standard offender to a sentence of twenty years at one hundred percent release eligibility. On appeal, Owens argues: (1) the trial court erred in admitting evidence that he had threatened to kill the victim shortly before her death; (2) the trial court erred in admitting statements from the victim; (3) the trial court erred in allowing the State to exceed the scope of redirect examination in its questioning of a witness; (4) the trial court erred in admitting witnesses' observations of the victim's bruises; (5) the evidence is insufficient to sustain his conviction; (6) he is entitled to relief based on cumulative error; and (7) the trial court abused its discretion in sentencing him. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Robert D. Massey and Rebecca S. Parsons, Pulaski, Tennessee, for the Defendant-Appellant, Danny Owens.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Mike Bottoms, District Attorney General; and J. Douglas Dicus and Christi L. Thompson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

**Trial**

**State's Proof**

Parker Hardy, an detective with the Lawrence County Sheriff's Department, testified that he responded to a call on February 8, 2009, regarding a "possible d[ec]eased person" at Owens's residence. Detective Hardy was unsure whether the call had initially come in as a suicide. However, he said he never found a suicide note at the scene.

When Detective Hardy arrived at the scene, the paramedics and several other officers were present. He immediately observed Owens, who was sitting at a table in the kitchen with a washrag in his hand, and noted that Owens "didn't seem upset, very upset." Detective Hardy entered the living room where the victim was located, which was secured, and saw Vicki Owens, the deceased victim and Owens's wife, sitting in a rocking chair. He noted that the victim had multiple wounds from a single bullet and saw a Smith & Wesson .357 magnum revolver near her body. Based on the victim's wounds, it appeared as if the bullet had entered at the victim's cheek and exited at her left bottom jaw before entering her shoulder and exiting her arm. He stated that he retrieved the bullet fragments and bullet jacket from the living room floor.

Detective Hardy also collected the Smith & Wesson .357 magnum revolver. Prior to collecting it, he picked up the revolver, with Officer Daniels by his side observing, and cracked the cylinder open so that he could see the location of the ammunition in the cylinder. Detective Hardy took a photograph of the gun as he opened the cylinder, which contained four unspent rounds and one spent round. He immediately noticed that the top chamber, which was underneath the hammer, had an unfired round. He also noticed that there was a spent, fired round in the chamber to the left of the unfired bullet. Detective Hardy stated that when the cylinder of the gun in this case is closed, it will not rotate unless the trigger or the hammer is pulled. He also stated that the cylinder in this handgun rotated counter-clockwise. Detective Hardy stated that if a person pulled the trigger on this handgun one time, the spent round would be underneath the hammer. However, when he opened the cylinder of the handgun at the scene, the spent round was in the chamber just to the left of the chamber under the hammer. Detective Hardy explained that in order for a live round to be underneath the hammer of the revolver, as it was in this case, either the trigger would have to be pulled again, which would cause a second spent cartridge to be in the gun, or the hammer would have to be manually pulled again, or the cylinder would have to be taken out, rotated, and put back into the gun.

Detective Hardy stated that he later interviewed Owens at the sheriff's department, where Owens gave him a written statement of the events leading up to the victim's death.

He noted that Owens was not very emotional during the interview. Before giving his written statement, Owens signed a waiver of his Miranda rights. In the statement, Owens said that he woke up at 8:20 a.m., brushed his teeth, and had some coffee before getting dressed and going outside. He stated that his wife came outside and asked him what he was going to do that day. Owens said they were not arguing and "everything was fine." His wife went back inside the home and was not upset. Owens stated that he had gone into the garage to work on a scooter and lawnmower when he "heard a loud boom." He looked around the yard for the source of the noise and did not see anything. He then went inside the home, walked down the hall, and asked, "What was that?" When he did not hear a response, Owens walked into the living room and saw his wife's deceased body in the rocking chair. He immediately called 9-1-1, and a dispatcher told him to check his wife's pulse. He grabbed her hand, although he did not remember which hand he grabbed. He said that he did not believe he got any blood on his hands when he touched her hand and asserted that he did not touch his wife's body other than to touch her hand. He stated the gun was lying on the floor on his wife's right side, and he did not touch or move the gun. Owens stated that he normally kept this handgun loaded in his nightstand. He said he stood in the doorway to the kitchen while he waited for the paramedics and officers to arrive.

Detective Hardy said that Owens never mentioned anything to him about leaving his house the day of the victim's death. Owens told him prior to giving his statement that his wife was in a lot of pain and that his wife had confronted him about having a "possible relationship with another woman." However, Owens never asked to place these things in his statement, even though he was given a chance to review his statement and add, delete, or correct anything in his statement.

On cross-examination, Detective Hardy stated that he did not collect any evidence at the scene that would have supported a suicide. He said he asked for Owens to submit to a gunshot residue test to rule out the possibility of a homicide. He acknowledged that another officer took swabs of Owens hands with "cotton tipped swabs and nitric acid" because he did not have any gunshot residue kits in his patrol car. He also acknowledged that the gunshot residue test on the victim's hands was done by the medical examiner's office. Detective Hardy said he first became suspicious that the victim's death might be a homicide rather than a suicide when he opened the cylinder of the revolver and saw that "the spent shell casing was not underneath the hammer, where it should have been." However, he agreed that the victim did not have any defensive wounds. Detective Hardy admitted that he had never been trained to make markings on the ridges on either side of the chamber of a revolver to identify the chamber that was underneath the hammer. He said he obtained and examined the victim's medical records, although he did not specifically look for any medication that the victim may have been taking at the time of her death. Although he knew the victim had been to several doctors, he did not know the details of the treatment she was receiving or the

-3-

medication she had been prescribed. He stated that he did not do any research to determine whether the victim's medical records supported a suicide theory.

Patrick Daniels, an officer with the Lawrenceburg Police Department, testified that he was the first officer to arrive at the scene and that the paramedics arrived immediately after him. He stated that Owens looked "shook up a little bit" and was "real agitated, or nervous[.]" Owens told Officer Daniels that his wife had committed suicide and he pointed him in the direction of the his wife's body in the living room. He stated that he and the paramedics entered the living room, and he saw that the victim had suffered what appeared to be a gunshot wound to the head. When one of the paramedics determined that the victim had no pulse, he asked the paramedics to leave the room. Officer Daniels said that he stayed in the doorway between the kitchen and the living room until Detective Hardy arrived. He stated that the scene was secure and that no one tampered with the victim's body or the evidence while he was present.

During the hour that Officer Daniels was at the scene, he observed Owens sitting at the kitchen table and wiping his face with a dish rag. He said Owens "kept getting up and down, wetting the washrag, washing his hands, washing his face." He saw Owens wash his hands three or four times before submitting to a gunshot residue test.

When Detective Hardy arrived at the scene, Officer Daniels informed him that no one had been in the room with the victim except for him and the paramedics. They began examining the room together. Officer Daniels stated that he was standing next to Detective Hardy when Hardy retrieved the gun and cracked open the cylinder. Officer Daniels observed that there was a spent round in the chamber to the left of the chamber underneath the hammer, and "there wasn't a spent round under the hammer[,]" which was "exactly where [he] would expect to find one." Officer Daniels said that he had no doubt that the spent round was one cylinder to the left of the hammer. On cross-examination, he stated that he was never taught to mark the ridges on each side of the chamber to identify the chamber underneath the hammer.

Ronald Butrum, a paramedic with the Lawrence County E.M.S., testified that he arrived at the scene with two other paramedics. Butrum said that he was required to determine whether the victim was alive. He saw another paramedic check the victim's pulse, which did not disturb the position of the body. He asserted that neither he nor the other paramedics moved or touched anything in the room. Butrum said the officers asked him and his team to leave the room while they began their investigation. At that point, he went to the kitchen, where Owens was sitting at the kitchen table. Butrum said that Owens was "somewhat distraught" and was mumbling to himself. He and the other paramedics checked Owens blood sugar, which was "pretty high," and they made him sit down and relax. He

-4-

stated that Owens did not stay seated and went in and out of the bathroom to wash his hands and face. Butrum said that he saw Owens get up "four or five times" to wash his hands in the bathroom before he submitted to the gunshot residue test. He heard Owens make statements questioning why the victim had committed suicide but also heard Owens say that the victim believed he was having an affair. He never heard Owens say that the victim killed herself because she was in a lot of pain.

Loretta Hartsfield testified that she lived across the street from Owens and the victim and knew them both. She was aware that Owens had health problems. Although Hartsfield had heard the victim complain about her knee problems, she saw the victim walking around the block with her neighbor nearly every day. Hartsfield said that the day of the victim's death, she saw Owens walk to the end of his driveway and stand there for a little while before going back inside. She later realized that something had happened when she saw an ambulance parked in Owens's driveway and went over to speak with Owens, who was "sweating, and crying, wiping his face a lot." She asked him if he needed some orange juice to drink, and Owens told her that the ambulance was there because his wife had shot herself. When Hartsfield asked him why the victim would have committed suicide, Owens replied, "Because she thought I had a girlfriend." She also remembered that Owens was worried about who was going to help him with his insulin shots now that his wife was gone.

Tina Boyd, another neighbor, testified that on the morning of February 8, 2009, she saw Owens drive his green Dodge truck "down [the street]" and then "back up" about fifteen or twenty minutes later. She said she was sure that Owens was driving a green Dodge truck and that he did not have anyone with him. Around five to ten minutes after Owens had returned to his house, Boyd heard a 9-1-1 call on her police scanner for a suicide at Owens's home.

Dr. Feng Li, the Senior Associate Medical Examiner for Nashville and Davidson County, was declared an expert in the field of forensic pathology. Dr. Li testified that he performed the victim's autopsy. He stated that the victim's cause of death was a single gunshot wound to the head. He said that the bullet entered the right side of the victim's cheek, exited on the left side of her neck, re-entered on the victim's left shoulder, and exited on her left upper arm. Dr. Li stated that although the bullet did not penetrate the victim's brain, its force was absorbed and caused a contusion of the brain tissue. The victim's wounds also caused substantial blood loss.

Dr. Li said he listed the victim's manner of death as "undetermined" because he could not tell whether the victim's death was as result of homicide or suicide. He noted that the victim's gunshot wound was a close range, "near contact" wound that was angled, rather than perpendicular to the surface. Dr. Li said that gunshot wounds in suicides are typically on the

forehead, the temple, or sometimes inside the mouth and that wounds on other parts of the head were "very rarely" seen in suicides. He opined that the gunshot wound in this case was unusual because of the location of the wound and the direction of the bullet path.

Dr. Li said he ordered a "targeted" toxicology screen, rather than a more "comprehensive" screen, because he had a clear cause of death that was not from a suspected drug overdose. The targeted toxicology screen did not detect the presence of any of the specific drugs on the panel.

Dr. Li stated that he was unable to examine the weapon involved in the victim's death before performing the autopsy. When he picked up the gun in court, he noted that it was a "heavy weapon" and opined that it would be "difficult to hold this weapon . . . with the type of direction and the range as, you know, self-inflicted."

On cross-examination, Dr. Li admitted that he could not conclude whether the victim's death was a homicide or a suicide. He also admitted that the absence of a suicide note did not mean that the death was not a suicide and that the fact that the head wound was in an unusual place did not mean that it was not self-inflicted. He acknowledged that he did not observe any defensive wounds on the victim during the autopsy. He further acknowledged that Trazodone, Neurontin, and Gavepentin/Graylise would not have been detected by the targeted drug screen that he ordered. He said that Trazodone was prescribed for the treatment of depression and that Graylise and Neurontin were prescribed for neuralgia or pain related to nerves. He acknowledged that several of the drugs that the victim had been prescribed had warnings about possible increases in suicidal thoughts or behavior.

On redirect examination, Dr. Li said that it was not unusual for the victim of a homicide not to have defensive wounds. He stated that because some homicides happen quickly, there may not be defensive wounds on the victim.

Dana Loudermilk, the victim's thirty-six-year-old daughter, testified that she and her mother had a "[v]ery close" relationship and talked several times a day. She said her brother was getting married on May 9, 2009, and "and so we were planning his wedding." She also said her mother had requested vacation time so that she could attend the wedding in Destin, Florida. Loudermilk said her mother was "really looking forward" to the wedding and was "[e]xcited" that her son had "finally decided to just settle down."

Loudermilk stated that the day before her mother's death, she had seen her mother and Owens at Wal-Mart. She said her mother was in a "very good" mood, was buying Valentine's gifts, and was teasing her grandchildren. At the time, Loudermilk noticed that

Owens was "very standoffish" and acted as if "something was bothering him." She noticed that Owens did not pick up her son, despite the fact that he usually did so.

Loudermilk stated that the Thursday before her mother's death, her mother informed her that she believed Owens was having an affair with a woman who worked at the Buffalo Road Market. She said her mother had complained about Owens's infidelity during the marriage on other occasions, although she had never appeared suicidal when Owens was unfaithful. Instead, Loudermilk described her mother as "a very happy, happy lady. You know, loved life, loved all of us, loved [her husband]." She said she was aware of her mother's health problems, which included diabetes, arthritis, knee problems, and stress fractures on her feet, for which she was seeking treatment from an orthopedist. However, she stated that her health problems never kept her from working, cooking, or getting around. She stated that her mother did not like guns, that she had never seen her mother shoot a gun, and that she had never heard her mother talk about shooting a gun. Loudermilk acknowledged that she, her brother, and her sister had filed a civil wrongful death suit against Owens and had obtained a default judgment against him.

On cross-examination, Loudermilk acknowledged that she and her siblings had sued Owens for 9.7 million dollars in the wrongful death lawsuit. She also acknowledged that the order from the wrongful death lawsuit stated that if Owens was found guilty of murder or a lesser included offense, the plaintiffs could proceed to collect their $4.5 million. She also acknowledged that the order said that if Owens were found not guilty at trial, then the default judgment could be set aside and additional litigation could occur.

On redirect examination, Loudermilk stated that no one in her family, other than Owens, had received any money from the victim's bank accounts, 401(k) accounts, or any proceeds from any life insurance policies following the victim's death. In addition, she said that Owens refused to allow her to retrieve some of her mother's personal belongings and had sold some of her mother's jewelry and belongings at a flea market.

Margaret Holder, the victim's mother, testified that she talked to the victim on the phone two days before the victim's death. During their conversation, she overheard the victim talking to Owens in the background. Holder stated that the victim said, "Oh, I see what you done. You've been buying yourself a toy." Owens replied, "Yes, I sure have." Then he said, "I bought myself a [.]357." And then Owens said, "I'm going to kill your God damn ass." When Holder heard this, the victim told her that she had to go and hung up the phone.

On cross-examination, Holder acknowledged that she waited until August 31, 2011, to tell law enforcement about Owens's threat. She said she thought she had informed Dana

Loudermilk and her other grandchildren about Owens's threat prior to disclosing it to law enforcement. Holder stated that she gave her statement about Owens's threat to the victim to Tennessee Bureau of Investigation (TBI) Agent Wesson when he came to see her.

Ramona Lafferty testified that she began dating Owens after Owens claimed he had divorced his wife, the victim. She later discovered that Owens was still married to the victim, and they were merely separated at the time. She said Owens eventually divorced the victim, and she and Owens continued dating. Lafferty stated that she ended the relationship with Owens when he returned to the victim and remarried her. A few months prior to the victim's death, Owens called her and asked if she would go out with him while the victim was out of town for a long weekend. When she refused, Owens asked, "If I wasn't married to her, would you still be with me?" Lafferty replied, "Maybe." She said she next heard from Owens two weeks after the victim's death when he left a message on her answering machine, stating: "Now that she's dead, will you talk to me?" She said she immediately notified the sheriff's department about Owens's message. However, Owen's message was erased as a result of a storm before law enforcement could obtain a copy of it.

John Melton, a special agent with the TBI, testified that he and another agent met with Owens at his home on July 8, 2010. During this meeting, Owens agreed to be interviewed at their field office because he "didn't have anything to hide." Prior to the interview, Agent Melton informed Owens that he was not under arrest and was free to leave at any time. He then advised him of his Miranda rights and got him to sign a waiver of his rights. When he asked Owens about the victim's medical conditions, Owens said that his wife had substantial pain in her arms and legs and had been prescribed several medications. However, he was unable to provide the names of these medications. Owens never mentioned that his wife was suffering from depression or any mental illness.

Agent Melton stated that Owens told them what happened prior to the victim's death, but he never mentioned anything about leaving his home that morning. Owens said that after he discovered his wife's body, he called 9-1-1. The 9-1-1 operator told him to check his wife's pulse, but he did not check her pulse because he did not know how. He did touch one of his wife's hands, which was still warm, but he believed that she was dead. Owens stated that he did not get any blood on his hands when he touched his wife's hand and that he did not need to wash his hands to remove any of his wife's blood. He stated that he "remained fairly calm" after discovering his wife's body because of his heart condition. Owens told Agent Melton that his wife had threatened to shoot herself in the past because of his affairs and that she had told her daughter, Dana Loudermilk, that she was going to shoot herself. He stated that he believed the victim committed suicide because she had been accusing him on nearly a daily basis of having an affair with a woman who worked at a local market.

Agent Melton told Owens that he did not believe that the victim had committed suicide because the fired cartridge was not underneath the hammer of the gun. Owens argued that the cylinder of the gun should have rotated to a live round after the trigger was pulled. He denied cleaning the handgun or manipulating the handgun's cylinder and denied even touching the handgun the day of the victim's death.

Agent Melton then asked Owens about Mona Lafferty, and Owens admitted that he had been in a sexual relationship with Lafferty during his marriage. When Agent Melton asked if Owens had talked to Lafferty about going out with him while his wife was out of town, he acknowledged that "he might have had that conversation." Owens told Agent Melton that he had sexual relations with Lafferty and other women, stating, "I just hit them and go on. Then go back in a few weeks." When Agent Melton asked Owens if he had left a message on Lafferty's machine asking her to go out with him now that his wife was dead, Owens acknowledged that he "might have said that." Owens denied any involvement in his wife's death. He then asked to end the interview. Agent Melton stated that he was unable to obtain a written statement from Owens because he discontinued the interview.

Mary Cotton, the victim's supervisor at Jones's Apparel in Lawrenceburg, testified that she had worked with the victim for twelve years and knew that Owens and the victim "had a troubled relationship" which often caused the victim to be upset at work. She stated that she had observed bruises on the victim's wrists and arms on several different occasions. However, she said that she never gave the victim any advice regarding these bruises because she was her direct supervisor. Cotton stated that prior to her death, the victim was "very excited about her son's wedding," had been shopping for a dress to wear, and frequently discussed her son's wedding with her co-workers. Cotton stated that the victim had no physical problems that prevented her from performing her job as a garment inspector and that she had noticed no changes in the victim's performance or behavior prior to her death. On cross-examination, she acknowledged that she did not know what caused the victim's bruises.

Suzanne Lafferty, a special agent forensic scientist to the latent print unit of the TBI, was declared an expert in the field of latent print identification and analysis. She stated that she did not find any identifiable latent prints on the revolver involved in the victim's death.

Laura Hodge, a special agent forensic scientist with the TBI, was declared an expert in the field of gunshot residue. She testified that she received a gunshot residue kit taken from the victim and a gunshot residue kit taken from Owens. Agent Hodge testified that she did not test the gunshot residue kit taken from Owens because the kit "appeared to be a homemade kit" that did not meet the TBI protocols. She stated that she tested the gunshot residue kit that was taken from the victim at the medical examiner's office and that the

results were "inconclusive," which meant that she was unable to eliminate the possibility that the victim had fired, handled, or been near the handgun when it was fired. Agent Hodge acknowledged that a person could "wash away the gunshot residue" by washing one's hands.

Rhonda Journey, a former neighbor from Giles County, testified that one night in the summer of 2003 Owens placed the victim's personal items in boxes by the side of the road. The victim called the police to see if they could help her. Ultimately, Journey stored the victim's items in her shed. That same night, around midnight, Journey heard the victim screaming for help and banging on her bedroom window. She then heard the victim say, "No, Danny, no." Journey said she could hear the victim and Owens having a physical confrontation on her back deck, and she called 9-1-1. However, by the time the police arrived, the victim and Owens had returned to their home.

Donald Ward, a deputy with the Giles County Sheriff's Department, testified that on June 22, 2003, he was dispatched to the Owens residence in Giles County because the victim had called to inform them that Owens was putting her personal belongings outside and she needed assistance. Deputy Ward stated that he talked to both parties and observed Owens consume several beers in his presence. He also noticed that Owens became emotional and began having a severe nosebleed, which required him and the other officer to call an ambulance. He said the victim comforted him during the nosebleed. After approximately an hour, Deputy Ward and the other deputy left the residence. Around two hours later, Deputy Ward received a second call from a neighbor, Rhonda Journey, who reported a domestic disturbance between the victim and Owens. When he returned to the house, Deputy Ward noticed that the victim's eyes were "bloodshot, watery[,]" that she had an injury inside her mouth on her lower lip, a scratch under her jaw on the left side of her face, and a swollen right wrist. He did not recall what Owens's demeanor was at the time he returned to the residence, but he remembered that Owens was present. Deputy Ward said that he read the Victim's Rights form to the victim and left a copy with her.

Shirley Brown, who also worked with the victim, testified that she talked to the victim the Thursday or Friday before her death. During this conversation, the victim told her that she was excited about her son's upcoming wedding and had been helping make the arrangements. Brown recalled that the victim was wearing a boot on her foot for a stress fracture at the time but wanted to talk about her son's wedding rather than her foot and did not appear to be depressed. Brown said she was aware that the victim had a "very rocky, unstable relationship" with Owens. In particular, she remembered one Monday that the victim was not very talkative at work. When she went to talk to the victim to see what was wrong, she observed fingerprint marks on the victim's neck. Brown talked to the victim about these marks and told the victim that she could get help and could go to the women's

shelter because "she did not have to take this." The same day, the victim also showed Brown a bruise on her right leg.

Melba McKey, another co-worker, stated that the Friday before the victim's death, the victim told her that she believed Owens was cheating on her with a woman from the Buffalo Market and asked her about what she should do. When McKey advised her to confront Owens about the affair and leave him, the victim initially said that "she couldn't leave him." However, the victim eventually told her that she was going to confront Owens about the affair. McKey said that over the twelve years she had known the victim, she had seen physical manifestations of her troubled relationship with Owens, which included bruises on the victim's neck and arm. McKey said that when she asked about the bruises on the victim's neck, which looked like fingerprints, the victim said Owens had choked her. McKey also observed a bruise on the victim's arm. When she saw these bruises, McKey told the victim that she needed to leave Owens if he was abusing her, and the victim replied, "You don't understand. I can't leave." She said the victim often came into work upset on Mondays, and McKey would tell her to leave him and get help. She acknowledged that the victim had talked to her about Owens's infidelity on more than one occasion.

McKey said the victim was excited about her son's wedding, was planning a shower for him and his fiancee, and was looking for a dress to wear to the wedding. She stated that the victim was wearing a boot on her foot shortly before her death but that it did not stop her from working. McKey said that although the victim had talked to her about Owens's infidelity the Friday before she died, she did not seem unusually depressed and did not appear suicidal. She said the victim never had talked about suicide and "was always talking about . . . her kids, and grandkids, and stuff that was going on with them."

Karen Powell, another co-worker, testified that the victim was excited about her son's upcoming wedding and was looking for a dress to wear. She also stated that the victim was throwing her son a wedding shower and had made arrangements to attend the wedding in Florida. She said that the victim's only medical condition that she was aware of was a stress fracture to her foot, which prevented her from working a few days. Powell said she had observed bruises on the victim a few times and had seen "hand marks around [the victim's] neck one time." She also saw a big bruise on the victim's leg and bruises on her arms on different occasions. When she saw these bruises, she told the victim she needed to leave, and the victim told her that she could not leave. Powell said that the week prior to the victim's death, the victim told her that she thought Owens was cheating on her and was thinking about confronting him about the affair the weekend she died. Powell said that on Friday, the victim stated, "I'm going to confront him. I'm just going to do it." She said the victim never mentioned harming herself or committing suicide. Powell admitted that the victim had suspected Owens of cheating on her several times over the years.

Carol Wright, the human resources director at Jones's Apparel, testified that the victim had a life insurance policy and a 401(k) plan that named Owens as the beneficiary. Approximately one week after the victim's death, Owens asked her if the victim had a life insurance policy, the amount of the policy, and the beneficiary of the policy. Owens presented Wright with a copy of the victim's death certificate, which indicated that it was pending investigation. A few months later, Owens brought another death certificate stating that the victim's cause of death was "unknown." Wright stated that Owens later received $62,000 from the victim's life insurance policy. She said he also received the funds that were in the victim's 401(k) plan, although she did not know the amount of these funds because the 401(k) accounts were managed by another company.

Steve Scott, a special agent in the Firearms Identification Unit of the TBI, was declared an expert in the field of firearms examination and identification. He testified that he examined the Smith & Wesson .357 magnum revolver involved in the victim's death. Agent Scott noted that this particular revolver had a large frame, which made it heavier, so that it would absorb some of the recoil from the .357 magnum cartridges. He stated that the cylinder in this revolver would rotate only if the hammer was manually cocked in a single-action firing, or if the trigger was pulled in a double-action firing, or if the gun was manipulated or the cylinder was opened and manually moved. He stated that regardless of whether the revolver was fired in single-action or double-action, the spent cartridge would end up underneath the hammer unless the gun was manipulated. He agreed that it took human manipulation for the spent cartridge to end up one spot to the left of the hammer. He stated that only one of the cartridges in the gun had been fired.

On cross-examination, Agent Scott stated that it was TBI procedure to take a permanent pen and mark the flutes on the cylinder of a revolver before opening the cylinder to identify the particular chamber that was underneath the hammer. He said the revolver in this case did not contain such markings.

Several stipulations were entered into evidence, which included: (1) the victim's medical records from the Mid-Tennessee Bone and Joint Clinic, which showed that she had been treated for knee, ankle, foot, elbow, neck, shoulder, and back pain and had undergone several surgical procedures; (2) the victim's Kroger pharmacy records, which showed that she had received 66 prescriptions from four different doctors, including prescriptions for Trazodone, Hydrocodone, Gabapentin, and other medications; and (3) the victim's Wal-Mart Pharmacy records, which showed several prescriptions for Trazodone.

**Defense's Proof**

Charles Hardy, a special agent with the TBI who worked at the Nashville Crime Laboratory, was declared an expert in the field of serology and DNA analysis. Agent Hardy testified he tested soap from the bathroom sink, a rag from the washing machine lid, Owens's clothing, a hand towel from the storage building, a washcloth from the northwest bathroom, a swab from the bathroom sink, a washcloth and red rag from Owens, and a revolver from the living room for DNA. He found that the washcloth from the bathroom and the swab from the kitchen sink contained Owens's blood. He stated that the revolver contained such limited DNA that he was unable to obtain a DNA profile that belonged to a particular individual.

Linda Littlejohn, a special agent forensic scientist with the TBI, was declared an expert in the field of microanalysis of fibers. She stated that she looked at the fibers that were collected from the victim's body and was asked to compare these fibers to the fibers from the towels collected from the garage and the victim's clothing. She stated that because all the fibers collected contained white cotton fibers, she was unable to determine the source of the fibers collected from the victim's body.

Tony Beard, a corporal with the Lawrence County Sheriff's Department, testified that he secured the crime scene until Detective Parker arrived. Corporal Beard stated that he kept a log of everyone who entered and exited the crime scene.

Robert Denton, a criminal investigator with the Lawrence County Sheriff's Department, testified that he assisted in collecting evidence and investigating the victim's death. He remembered that Owens sat at the kitchen table and appeared distraught at the scene. He did not observe Owens washing his hands or wiping his face.

Jeffrey Smith, one of the paramedics who arrived at the scene, testified that he noted the medications that had been prescribed to the victim, which included Trazodone, Gabapentin, Estradiol, Benicar, and Prevacid. He stated that Owens gave him information about the victim's medical history and showed him the victim's medicine bottles. Smith stated that Owens talked to him about the victim's leg and foot pain but did not tell him that the victim was suffering from mental illness or depression.

William and Deborah Wilkerson, nearby neighbors, testified that Owens was standing on his deck between 10:45 and 11:00 a.m. on February 8, 2009, and waved at them as they left for church. Deborah Wilkerson stated that she attended the victim's funeral and that Owens was "real[ly] sad" and was crying.

Brian Robinson, the funeral director at Neal's Funeral Home, testified that Owens paid for the victim's funeral. He said that although there was a dispute over where the victim would be buried, Owens relented and allowed the victim to be buried at the location that her children had chosen. Robinson stated that during the meeting, Owens was "distraught[,]" "visibly upset[,]" and his eyes were red because he had been crying.

David Brundage, a retired employee with the Illinois State Police and the Marion County Forensic Services Agency, was declared an expert in the field of firearm identification. Brundage opined that if the gun had been fired by the victim, it would have been with her right hand because the entry wound was on the right side of her face. After looking at one of the crime scene photographs, he noted that there was a red substance, perhaps blood, on the fingers of the victim's right hand. He said he was unable to review the test results of the red substance on the victim's right hand because no test had been requested. Brundage stated that he was trained to mark the flutes of the cylinder of a revolver with a permanent marker before examining it in order to clearly identify the cartridge that was underneath the hammer. He stated that releasing the cylinder catch would cause the cylinder to move. After examining the autopsy report and photographs, Brundage opined that the Smith & Wesson revolver was fired one to three inches from the victim's head and had been fired at an angle.

On cross-examination, Brundage acknowledged that once the gun in this case was fired, the spent round would remain underneath the hammer unless human manipulation caused the cylinder to move. He also acknowledged that because the cylinder on this gun was stiff, it was unlikely that operating the release on the cylinder would cause the cylinder to fly open and rotate, especially if an officer was holding the revolver down when the cylinder was released. Brundage agreed that another way to identify the cartridge that was under the hammer was to carefully release the cylinder and visually see where the spent round was located.

Daniel Smith, whose mother lived near Owens, testified that he had a beer with Owens a couple of months after the victim's death. Shortly thereafter, law enforcement came to his house on a Saturday night and asked him to drive to the police station. When he told them that he could not drive because he was intoxicated, the officers drove him to the station, where they "tried to put words in his mouth" about Owens's involvement in the victim's death. He stated that officers Beard and Bartrum questioned him for approximately four or five hours before releasing him.

Greg Owens, the Defendant-Appellant's son, testified that his father was emotional and crying immediately after the victim's death. He also stated that his father was crying and screaming his wife's name at her funeral. Greg Owens said his father drove a green,

Chevrolet truck, not a green Dodge truck, and identified a photograph of his father's truck at trial. He stated that his father had previously owned a green Dodge truck but had sold it in 2006.

The tape of Owens's 9-1-1 call was played for the jury.

**Sentencing Hearing.** At the June 4, 2012 sentencing hearing, the State admitted a copy of the presentence investigation report and photographs of the victim during her lifetime. The defense entered nine letters from Owens's family and girlfriend into evidence, as well as records from Owens's treating physicians and surgeons that detailed his health problems, which included coronary artery disease, diabetes, hypertension, circulatory problems, and heart problems that required two heart by-pass surgeries.

Dana Loudermilk, the victim's daughter, testified that part of her died the day her mother passed away. She said that because of her mother's death, she had to miss work, attend grief counseling, and seek counseling from her minister. She stated that to date, she and her siblings had not received any monetary benefits from her mother's estate. In addition, she said that Owens had sold or given away most of her mother's belongings and jewelry. Loudermilk stated that Owens had taken all the funds from her mother's bank accounts, life insurance policy, and 401(k) plan. She asserted that her mother never told her that she wanted to kill herself.

Kevin Matlock, the victim's son, testified that his mother had three children and four grandchildren and that they were a very tight-knit family. He stated that his mother's death had negatively impacted the entire family.

## ANALYSIS

Initially, we note that Owens has failed to include the transcript from the motion for new trial hearing in the record on appeal. The appellant has the burden of ensuring that the appellate record contains a fair, accurate, and complete account of what has occurred regarding the issues that are the bases of the appeal. See Tenn. R. App. P. 24(b); State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). The appellant risks waiving the issues on appeal if an incomplete record is submitted to this court. Here, the State has not asserted that Owens waived his issues on appeal by failing to include this transcript, and the appellate record contains the transcripts from the pretrial motions and trial, Owens's motion and amended motion for new trial, and the trial court's order denying the motion for new trial. Therefore, waiver notwithstanding, we will address Owens's issues on their merits.

**I.  Admission of Owens's Threat Against the Victim.**  Owens argues that the trial court did not substantially comply with Rule 404(b) before declining to suppress evidence of a alleged threat, overheard by Margaret Holder, that he made to the victim.  He also argues that the trial court erred in allowing the State to ask Holder about this threat a second time during her testimony.

**A.  Failure to Substantially Comply with Rule 404(b).**  First, Owens asserts that the trial court did not substantially comply with Rule 404(b) in refusing to suppress Holder's testimony.  He claims that although the trial court conducted a pretrial hearing, it failed to determine that a material issue existed, other than conduct conforming with a character trait; failed to find by clear and convincing evidence that he made this threat; and erroneously used the standard in Tennessee Rule of Evidence 403 rather than the standard in Rule 404(b)(4) in declining to suppress this evidence.  Consequently, he asserts that this court should give no deference to the trial court's ruling and should consider the evidence offered at the pretrial hearing, or the lack thereof, in determining whether this evidence should have been admitted.

In addition, Owens argues that Holder's testimony shows only that he had the propensity to verbalize threats but does not show that he murdered the victim and does not "rise to the level of becoming a material issue at trial."  He claims that the trial court could not have found by clear and convincing evidence that this threat occurred because Holder never testified at the pretrial hearing.  He also contends that the probative value of this evidence is outweighed by its prejudicial effect because "the jury could not have helped but consider [his] propensity for threats and alleged desire to kill when rendering [its] verdict."  Finally, he questions why Holder did not give her statement to investigators regarding Owens's alleged threat until August 31, 2011, given that the victim's death occurred more than two years earlier on February 8, 2009.

Here, the State properly filed a notice of intent to use Holder's testimony regarding Owens's threat against the victim, and the defense filed a motion to suppress this evidence.  In his suppression motion, Owens argued that Holder's testimony regarding his alleged threat to the victim was inadmissible testimony and was "useful only for the expressly forbidden purpose of proving [his] propensity to act in conformity with a character trait, and [was] therefore inadmissible."

At a pretrial hearing, the State informed the court that it did not want to force Holder to come to court more than one time because she was elderly and used a walker.  The defense acknowledged that the court could rule on the admissibility of Holder's testimony based on her written statement to the TBI investigator.

At the pretrial hearing, the defense acknowledged that Holder's testimony would be that during a conversation with the victim, she overheard Owens tell the victim that he was going to kill her with a .357 revolver. The trial court ruled that Owens's threat to the victim was admissible. It noted that Holder could testify about the Owens threat because she could identify her son-in-law's voice over the phone. When defense counsel asked if Holder's testimony would be admissible under hearsay and Rule 404, the court replied that it would be admissible under both. Regarding the hearsay challenge, it held that Owens's threat was an admission by a party opponent. In addition, regarding the Rule 404 challenge, it held that "the prejudicial effect [of Holder's testimony did] not substantially outweigh whatever the probative value of [the] statement is, okay. So I'm going to let that come in." During this hearing, the defense never objected to Holder's failure to testify, never argued that the court failed to determine whether the proof of this bad act was clear and convincing, and never asserted that the court used the improper standard in weighing the probative value of the evidence against the unfair prejudice. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). The court later entered an order denying Owens's motion to suppress Holder's testimony pursuant to Rule 404(b) because "the statement's probative value [was] not substantially outweighed by its prejudicial effect."

We note that evidence of a defendant's character offered for the purpose of proving that he or she acted in conformity with that character is inadmissible. See Tenn. R. Evid. 404(a). However, evidence of other crimes, wrongs, or bad acts may be admissible for other purposes if this evidence satisfies the conditions in Rule 404(b).

Rule 404(b) states:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed
by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The term "other purposes" in the aforementioned rule has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (citing State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. Jan. 22, 2003)).

If a trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Baker, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision should be afforded no deference by the reviewing court. DuBose, 953 S.W.2d at 652.

In this case, the trial court properly conducted a hearing outside the presence of the jury. We note that at the pretrial hearing Owens failed to request that the trial court state the material issue other than conduct conforming to a character trait, its ruling, and the reason for admitting the evidence. See Tenn. R. Evid. 404(b)(2). That being said, we acknowledge that the trial court did not explicitly determine that a material issue existed other than conduct conforming with a character trait, did not find proof of the other crime, wrong, or act to be clear and convincing, and did not use the correct standard in determining whether to exclude the evidence. See Tenn. R. Evid. 404(1), (3), (4). Because the trial court failed to substantially comply with the requirements of the rule, its decision is entitled to no deference, and we most conduct a de novo review. DuBose, 953 S.W.2d at 652. In conducting this review, we must consider the evidence presented at the pretrial hearing in determining the admissibility of the evidence under Rule 404(b). Id. at 653.

After conducting our de novo review, we conclude that the trial court properly determined that Holder's testimony was admissible under Rule 404(b). Evidence that Owens, two days before the victim's death, threatened to shoot the victim with his .357, the same weapon that caused the victim's death, goes to the material issue of Owens's motive and intent to kill the victim. Owens's intent is of particular significance in this case because the jury had to determine whether the victim's death was the result of homicide or suicide. See State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993) (holding that evidence of the defendant's threats to kill the victims "was admitted not to prove the Defendant acted in accord with this character but as part of the proof establishing his motive for the killings");

-18-

State v. Glebock, 616 S.W.2d 897, 906 (Tenn. Crim. App. 1981) (stating that evidence that the defendant broke into the victim's apartment and sent the victim a threatening postcard were relevant and admissible because they "indicate[d] hostility toward the victim and a settled purpose to harm or injure her"). Although Holder did not testify at the pretrial hearing, she had at the time of the hearing given a written statement to a TBI investigator, and she later testified in accordance with that written statement at trial, so we find proof of this evidence to be clear and convincing. Moreover, the defense conceded that Holder's appearance at the pretrial hearing was not necessary. Finally, we find that the extremely probative value of this evidence was not outweighed by the danger of unfair prejudice. State v. James Michael Naive, No. M2012-00893-CCA-R3-CD, 2013 WL 4505395, at *18 (Tenn. Crim. App. Aug. 21, 2013) (concluding that the probative value of the defendant's threatening voicemail for the victim a few days prior to her murder was not outweighed by the danger of unfair prejudice pursuant to Rule 404(b)); State v. Shelly Minor, No. W2010-01677-CCA-R3-CD, 2012 WL 3055776, at *9 (Tenn. Crim. App. July 26, 2012), perm. app. denied (Tenn. Jan. 22, 2013) (holding that the probative value of prior incidents of the defendant's violent, abusive behavior toward the victim was not outweighed by the danger of unfair prejudice pursuant to Rule 404(b)). Therefore, we conclude that the trial court did not err in admitting Holder's testimony about Owens's threat against the victim.

**B. Repetition of Holder's Testimony.** Owens also argues that the trial court erred in allowing Holder to repeat her testimony about Owens's threat to the victim, over the defense's objection. He asserts that the repetition of this evidence allowed the State to emphasize its extremely prejudicial nature, which suggested a decision on an improper basis. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (noting that unfair prejudice in Rule 403 has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one").

Here, Owens objected on the basis that the question had been "asked an answered." He claims that the trial court committed reversible error in ruling, "I'm going to . . . let [the prosecutor] ask one more time, like I did with you." We note that "[t]he propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion." State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992) (citing Edwards v. State, 424 S.W.2d 783, 786 (Tenn. 1968); State v. Elliott, 703 S.W.2d 171, 176 (Tenn. Crim. App. 1985)). The court indicated that it was giving the State the same leeway in questioning that it had given the defense several times during trial. The record shows that the State repeated its question to Holder a single time. Moreover, as noted by the State, the defense asked Dr. Li about his inability to determine the manner of the victim's death multiple times at trial. When the State objected on the basis that this question had been "[a]sked and answered, Your Honor, about 10 times," the court replied, "Well, it's cross. I'll let him go one more time." Our review of the trial transcript

shows that the court allowed both the State and the defense to repeat questions to witnesses regarding key pieces of evidence. Accordingly, we conclude that the trial court did not abuse its discretion in allowing Holder to repeat her testimony.

**II. Admission of the Victim's Statements.** Owens argues that several statements made by the victim were improperly admitted. Specifically, he claims that the trial court erred in allowing Dana Loudermilk, Mary Ellen Cotton, Melba McKey, Shirley Brown, and Karen Powell to testify about the victim's statements regarding her excitement about her son's upcoming wedding. He also claims that McKey should not have been allowed to testify about the victim's statements regarding Owens's infidelity and her intent to confront him about his new girlfriend. Owens asserts that the victim's statements are hearsay and do not fall within a recognized hearsay exception. Moreover, he claims that the victim's statements "rebut[ted] the position that the decedent committed suicide" and "bolster[ed] the state's theory that [he] was a womanizing abusive husband."

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Rule 802 states that "hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. "'The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.'" State v. Thomas, 158 S.W.3d 361, 400 (Tenn. 2005) (quoting State v. Stout, 46 S.W.3d 689, 697 (Tenn. 2001)). This court will not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)).

The exception to the hearsay rule for statements regarding the declarant's state of mind or physical condition states that the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Tenn. R. Evid. 803(3). The Advisory Commission Comment for this hearsay exception states: "This is the state of mind hearsay exception, long recognized by Tennessee courts. Combining the hearsay exception with relevancy principles, declarations of mental state will be admissible to prove mental state at issue or subsequent conduct consistent with that mental state." Tenn. R. Evid. 803(3), Advisory Comm'n Comment.

**A. Excitement about Son's Wedding.** Owens argues that the trial court should not have admitted testimony from Loudermilk, Cotton, McKey, Brown, and Powell about the victim's statements that she was excited about her son's upcoming wedding. He contends that this testimony prejudiced him because it refuted his claim that the victim committed suicide.

At the pretrial hearing regarding these statements, Cotton testified that the victim "was really excited about her son's wedding" that summer and "had been looking for a dress." Brown testified that two or three days prior to the victim's death, the victim told her that her son was getting married. McKey testified that the victim had also told her that her son was getting married and that she was helping her son's fiancee plan the wedding shower in May. During the hearing, the trial court held that the fact that the victim "was making plans, she was doing this, she was calling setting up a place to have the wedding and that type of thing, I'm going to allow it to come in through these witnesses." However, the court held that it was not going to allow the witnesses to testify that the victim was not the type of person to commit suicide, stating, "If there are specific things where they get past lay testimony and get into expertise, psychological state of mind, that type of thing, you can raise the objection and we'll address it as it comes up." After the hearing, the court entered an order denying Owens's motion to suppress testimony from witnesses that the victim was planning the wedding of her son, "so long as the witnesses do not express what amounts to expert opinions." The testimony of Cotton, Brown, and McKey at trial was similar to their testimony at the pretrial hearing.

At a later pretrial hearing, Powell did not testify but the State informed the court that Powell's testimony would be consistent with the testimony of Cotton, Brown, and McKey. At trial, Powell testified that the victim was excited about her son's upcoming wedding and was looking for a dress to wear. She also stated that the victim was throwing her son a shower and that she was going to Florida for the wedding. In a later order, the trial court held that Powell could testify about "what she observed regarding the [victim's] demeanor[.]" Loudermilk testified at trial that the victim was excited about her son's wedding and that the victim was helping make the wedding arrangements. In its order, the court held that "statements relating to the deceased's son's upcoming nuptials will be admitted."

We conclude that this evidence was admissible because it was non-hearsay. The victim's statements regarding her excitement about her son's wedding were not offered to prove that she was, in fact, excited about the wedding but were instead offered to prove the victim's state of mind during the period prior to her death. As we previously noted, the victim's mental state was particularly significant in this case because the jury had to determine whether her death was the result of homicide or suicide. The victim's statements

that she was excited about attending her son's May wedding refuted the defense's theory that she committed suicide because she was in a great deal of pain or because she was taking medication that increased her risk for suicidal thoughts and behaviors. Admission of this evidence allowed the jury to consider whether the victim's happiness and excitement regarding her son's wedding made it unlikely that she would have committed suicide three months before her son's wedding. These statements were not offered for the truth of the matter asserted and were instead offered to show that her mental state prior to her death made it unlikely that she took her own life. Accordingly, this evidence was properly admitted as non-hearsay.

**B.  Owens's Infidelity and the Victim's Intent to Confront Him.**  Owens also argues that the trial court erred in allowing Melba McKey to testify about the victim's statements regarding Owens's infidelity and her intention to confront him about his cheating because these statements were hearsay and were not within an exception to hearsay. He again claims that these statements were prejudicial because they rebutted his claim that the victim committed suicide. He also argues that the jury decided his case based on their disapproval of his infidelity and used evidence that the victim was going to confront him about his infidelity as a motive for him to murder her.

At the pretrial hearing, McKey testified that on the Friday before the victim's death, the victim had told her that she believed that Owens was cheating on her. She told the victim to confront Owens about the affair and leave him. At the pretrial hearing, the court held, "I'm going to let the fact that [the victim] thought [Owens] was having an affair come in under the state of mind exception. Not all – and I don't think it's offered to prove . . . the truth of the matter asserted that he was [having an affair]. It was offered to prove that she thought he was." After the hearing, the court entered an  order denying Owens's motion to suppress because the victim's statements to McKey were not offered for the truth of the matter asserted and were admissible. McKey testified similarly at trial, with the exception that McKey stated that the Friday prior to the victim's death, the victim said that she was going to confront Owens about the affair. The defense never objected to McKey's testimony at trial. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

We recognize that whether this evidence is admissible as non-hearsay or as a state of mind exception to the hearsay rule is a close question. However, we conclude that this evidence was admissible under the state of mind exception to the hearsay rule because it established the victim's intent and plan to confront Owens about his infidelity at the time of her death. See State v. Trusty, 326 S.W.3d 582, 603(Tenn. Crim. App. 2010) (victim's statements about her fear of the defendant, which were made close to the time of her death,

-22-

were admissible under the state of mind exception to the hearsay rule and were relevant to show her state of mind at the time she made the statement and her behavior at the time of her death); State v. Hutchinson, 898 S.W.2d 161, 172 (Tenn. 1994) (victim's statement that he was going fishing "with the boys" was admissible to show his state of mind, i.e., that he intended to go fishing, and connected one of the defendants to the fishing trip where the victim was drowned). As we previously mentioned, the victim's state of mind was at issue in this case because Owens claimed that the victim's death was the result of suicide rather than homicide. The victim's intent to confront Owens was relevant because it provided a motive for Owens to kill her. Accordingly, Owens is not entitled to relief on this issue.

**III. The Scope of Loudermilk's Re-Direct Examination.** Owens contends that after the defense elicited favorable testimony from Dana Loudermilk on cross-examination, the trial court, over the defense's objection, allowed the State to question Loudermilk about whether Owens financially benefitted from the victim's death. Owens asserts that these questions exceeded the scope of redirect examination or were irrelevant.

"It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion." State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993) (citing Elliott, 703 S.W.2d at 176); see Harris, 839 S.W.2d at 72. Moreover, "[t]he admissibility of testimony and other evidence, as well as the scope of redirect examination, is within the discretion of the trial court, whose ruling will not be reversed absent an abuse of that discretion." State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (citing State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994)). Although the scope of redirect examination is not addressed by the Tennessee Rules of Evidence, "Tennessee law is well-settled that redirect examination can broach topics raised on cross-examination even though those matters were not inquired into on direct examination." State v. Baker, 966 S.W.2d 429, 433 (Tenn. Crim. App. 1997). We also recognize that the trial court "has discretion to permit the witness on redirect to testify about new facts that were not mentioned on direct or cross-examination." Neil P. Cohen et al., Tennessee Law of Evidence § 6.11[6][b] (4th ed. 2000).

Here, on direct examination, Dana Loudermilk testified that she, her brother, and her sister had filed a civil wrongful death lawsuit against Owens and that they had obtained a default judgment against him. Defense counsel cross-examined Loudermilk about the lawsuit's details, wherein she acknowledged that the parties had sued for 9.7 million dollars and that an order had been entered taking the judgment under advisement. She also acknowledged that the order stated that if Owens were found not guilty at trial, then the default judgment could be set aside and additional litigation could occur. On redirect examination, the State asked Loudermilk about Owens's receipt of the victim's bank account

proceeds, 401(k) proceeds, and life insurance policies. The defense objected on the basis that this evidence was outside the scope of cross examination, and the trial court ruled the State's questions on redirect examination were proper because the defense had "opened the door" to this evidence when it asked Loudermilk about the details of the wrongful death lawsuit. Loudermilk subsequently testified on redirect examination that no family member, other than Owens, received any funds from the victim's bank accounts, 401(k) accounts, or any proceeds from the victim's life insurance policy after her mother's death. She also stated that Owens did not allow her to have any of the victim's personal belongings and sold some of the victim's jewelry and other belongings at a flea market.

Owens asserts that his cross-examination of Loudermilk did not "open the door" to the State's questions on redirect examination because his questioning on cross-examination "merely expounded upon the wrongful death judgment" elicited during Loudermilk's direct examination. He asserts that the defense questioned Loudermilk about the default wrongful death judgment not to determine whether Loudermilk had received any financial benefit from her mother's death but to show that the default judgment would be set aside if he were found not guilty in the criminal case. In addition, he asserts that he was prejudiced by the trial court's allowing the State's questions on redirect examination because it allowed the State to bolster its theory that Owens murdered the victim to receive a financial windfall. He also argues that Loudermik's testimony that Owens prevented her from receiving any of her mother's personal belongings was irrelevant because it did not have the tendency to prove whether he committed the offense against the victim and was prejudicial because it had no purpose other than to invoke sympathy for Loudermilk and anger toward him.

We conclude that the trial court properly allowed the State to elicit testimony from Loudermilk that Owens was the only person to receive money from the victim's death and that Owens did not allow her to have any of her mother's personal belongings. As we previously recognized, a trial court has the discretion to allow a witness on redirect to testify about new facts that were not discussed during direct or cross-examination. See Neil P. Cohen et al., Tennessee Law of Evidence § 6.11[6][b] (4th ed. 2000). On cross-examination, Owens specifically asked Loudermilk how much she and the other plaintiffs had sued for in their wrongful death suit. Because Owens raised the issue of the amount prayed for in the wrongful death complaint, the trial court did not err in allowing the State to question Loudermilk about whether the victim's family had received any funds or belongings following her death. Moreover, the evidence elicited on redirect examination was relevant and admissible because it provided an additional motive for Owens to kill the victim, i.e., to obtain the victim's money and belongings. Accordingly, we conclude that the trial court did not abuse its discretion by allowing the State to pursue this line of questioning.

**IV.  Witnesses' Observations Regarding the Victim's Injuries.**  Citing State v. Gilley, 297 S.W.3d 739 (Tenn. Crim. App. 2008), Owens argues that the trial court erred in allowing Mary Cotton, Shirley Brown, Melba McKey, and Karen Powell to testify that they observed bruises to the victim, prior to her death.

Here, Owens filed pretrial motions arguing that testimony regarding the victim's bruises prior to her death was inadmissible pursuant to Rules 401, 403, and 404(b).  At the pretrial hearing, the trial court heard testimony from Cotton, Brown, and McKey.  Cotton testified that she observed bruises on the victim's arms and wrists on several different occasions.  Brown testified that in 2005, she observed fingerprint bruises on the victim's neck and a large bruise on the victim's leg.  McKey testified that she had observed bruises on the victim's neck and arms in 2005.  Following this testimony, the court stated that it would take all Rule 404(b) issues under advisement.

At a later pretrial hearing, the defense acknowledged that the State had filed a notice of prior bad acts that would be testified to by Karen Powell.  The defense further acknowledged that "based on the content of their notice, whether or not they've had sufficient time to talk to that witness, to really understand what she's going to testify to, so [that motion] we might want to look at on another date."  The State offered that although it did not yet have a written statement, Powell's testimony would be consistent with the testimony of Cotton, Brown, and McKey.  At the hearing, the court held that Cotton, Brown, McKey, and Powell could "testify as to what they saw, just not what [the victim] said."  Following this hearing, the court entered an order denying Owens's motion to suppress Cotton's testimony regarding the victim's bruises:

> [T]he court finds that there is a material issue other than conduct conforming with a character trait, that is the relationship of . . . Mr. and Mrs. Owens, Mr. Owens' intent, and Mr. Owens' motive.  The Court also finds the testimony of Ms. Cotton of the other wrong or acts on the part of Mr. Owens, as evidenced by the bruises to be clear and convincing.  Finally, the Court also finds the probative value of the testimony is not outweighed by the danger of unfair prejudice.

The court entered similar rulings regarding the testimony of Brown and McKey.  In a later order, the court held that Powell could testify "as to what she observed regarding the demeanor and physical appearance of the decedent" but that "[s]tatements from the decedent to Ms. Powell regarding the origin of her injuries shall be prohibited on hearsay grounds."  In addition, the court precluded Powell and any other witnesses from testifying about the victim's fear of Owens given that such testimony was "irrelevant and therefore inadmissible."

At trial, Cotton testified that she knew that Owens and the victim "had a troubled relationship" that often caused the victim to be upset at work. She said she had observed bruises on the victim's wrists and arms on several different occasions. However, Cotton acknowledged on cross-examination that she did not know how the victim had gotten these bruises. Brown testified that she knew the victim had a "very rocky, unstable relationship" with Owens. In particular, she remembered one Monday that the victim was not very talkative at work. When she went to talk to the victim to see what was wrong, she observed fingerprint marks on the victim's neck. Brown talked to the victim about these marks and told the victim that she could get help and could go to the women's shelter because "she did not have to take this." The same day, the victim also showed Brown a bruise on her right leg. McKey said that over the twelve years she had known the victim, she had seen physical manifestations of her troubled relationship with Owens in the form of bruises on the victim's neck and arm. When she asked about the bruises on the victim's neck, which looked like fingerprints, the victim said Owens had choked her. She also observed a bruise on the victim's arm. When she saw these bruises, McKey said she told the victim that she needed to leave Owens if he was abusing her, and the victim replied, "You don't understand. I can't leave." She said the victim often came into work upset on Mondays, and McKey would tell her to leave him and get help. Finally, Powell testified that she had observed bruises on the victim a few times and had seen "hand marks around [the victim's] neck one time." She also saw a big bruise on the victim's leg and bruises on her arms on different occasions. When she saw these bruises, she told the victim she needed to leave, and the victim told her that she could not leave. We note that Cotton, Brown, McKey, and Powell provided slightly different testimony at trial than at the pretrial hearing and that some of these witnesses indicated that Owens had caused the victim's bruises. However, Owens never objected to this testimony at trial and arguably waived this issue for review. We note that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a).

Waiver notwithstanding, we note that the trial court substantially complied with the requirements of Rule 404(b). The trial court properly conducted a hearing outside the presence of the jury. See Tenn. R. Evid. 404(b)(1). The trial court then determined that a material issue existed other than conduct conforming with a character trait, found proof of the other crime, wrong, or act to be clear and convincing, and properly weighed the probative value of the evidence against any unfair prejudicial effect. See Tenn. R. Evid. 404(b)(2), (3), (4). Because the trial court substantially complied with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. Thacker, 164 S.W.3d at 240 (citing DuBose, 953 S.W.2d at 652; Baker, 785 S.W.2d at 134). After reviewing the record, we conclude that the trial court did not abuse its discretion in admitting this evidence. We agree with the court that the probative value of this evidence outweighed the danger of

unfair prejudice because Owens claimed the victim's death was a suicide and the bruises on different occasions indicated a "settled purpose" to harm the victim. Smith, 868 S.W.2d at 574 ("[V]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim"); State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982) (concluding that evidence that the defendant had committed a crime against the victim was admissible because the details of the prior crime were relevant to the issue of the defendant's intent); Glebock, 616 S.W.2d at 905-06 (holding that evidence that the defendant broke into the victim's apartment and sent her a threatening postcard was admissible because it "indicate[d] hostility toward the victim and a settled purpose to harm or injure her"). After hearing the proposed testimony at the pretrial hearing, the trial court limited the testimony regarding the bruises to what these witnesses observed and precluded testimony about what the victim had told them about the bruises. In addition, the court held that these witnesses could not testify about the origin of the bruises or the victim's fear of Owens.

In Gilley, 297 S.W.3d at 758, this court held that a witness's testimony that she observed bruises that looked like fingerprints on the victim's upper arm, where the witness did not see the events causing the bruises, should not have been admitted under Rule 404(b) because it was "not relevant and potentially misleading." However, the court determined that admission of this witness's testimony was harmless error because several other eyewitnesses had testified that they observed the defendant abuse the victim. Id.

Owens, citing Gilley, argues that admission of the testimony from Cotton, Brown, McKey, and Powell is not harmless error because the State did not present testimony from a witness who personally observed Owens's abuse of the victim. He claims that each of these witnesses supported the State's theory that Owens was "a womanizing wife beater" and the jury would not have found him guilty if these witnesses had not testified. Contrary to Owens's claim, we note that Rhonda Journey testified that she personally observed a struggle between Owens and the victim on her back deck. Journey said she heard the victim scream for help and bang on her bedroom window. She then heard the victim say, "No, Danny, no." Journey stated that she called 9-1-1 after hearing the struggle. Moreover, Deputy Ward testified that when he went to the Owens residence in response to Journey's 9-1-1 call, he saw that the victim had sustained several injuries to her mouth, lip, face, and wrist. Moreover, Holder testified that she overheard Owens threaten to shoot the victim with his .357 revolver two days before the victim's death. See Tenn. R. App. P. 36(b). In contrast to the witness's testimony in Gilley, the testimony in this case closely connected Owens to the victim's bruises and established Owens's ongoing intent to harm the victim. Given the testimony from Holder and Journey, as well as the other evidence of his guilt, we cannot see

how Owens was unfairly prejudiced by the witnesses' testimony regarding the victim's bruises.

**V.  Sufficiency of the Evidence.**  Owens argues that the evidence is insufficient to support his conviction for second degree murder because the proof does not establish that he knowingly killed his wife.  In support of this argument, he asserts that:  (1) the medical examiner was unable to determine whether the victim's manner of death was homicide or suicide; (2) the results of the victim's gunshot residue test were inconclusive; (3) no identifiable fingerprints were found on the gun; (4) no DNA evidence connected him to his wife's death; (5) the results of the fiber analysis test did not connect him to his wife's death; (6) the victim had been taking medications with warnings about a possible increased risk for suicidal thoughts and behaviors; (7) the jury heard inadmissible evidence from several witnesses, as previously discussed; and (8) Detective Hardy's method of inspecting the gun was "suspect and inconsistent with the method described by expert witnesses Scott and Brundage[.]"

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979).  Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."  Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).  The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence."  Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory."  Bland, 958 S.W.2d at 659.  A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

-28-

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Owens was convicted of second degree murder, which is defined as "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010); State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the assault, the nature of the act, and from all of the circumstances of the case in evidence. Inlow, 52 S.W.3d at 105.

We conclude that the evidence, though circumstantial, is sufficient to sustain Owens's conviction for second degree murder. Holder testified that the Friday before the victim's death, she overheard Owens threaten to kill the victim with his new .357 revolver. Journey, a former neighbor, testified that she called the police after witnessing a physical altercation

between Owens and the victim. Deputy Ward, who responded to Journey's call about the domestic disturbance between Owens and the victim, testified that he saw that the victim had sustained injuries to her mouth, lip, face, and wrist when he arrived at their residence. Cotton, Brown, McKey, and Powell, the victim's co-workers, testified that the victim had a violent, unstable relationship with Owens and that they had observed bruises on the victim in the past. Brown, McKey and Powell testified that they had advised the victim to leave Owens several times.

The defense theory at trial was that the victim had committed suicide. Although Owens argues on appeal that some of the evidence at trial supported his defense of suicide, we conclude that there was more than sufficient evidence to support the State's theory that Owens knowingly shot and killed the victim. We note that it is the jury's duty to resolve conflicts in the evidence. See Odom, 928 S.W.2d at 23. Despite the fact that there was conflicting evidence regarding whether the victim committed suicide, the jury rejected the defense's theory of suicide in favor of the State's theory that Owens had knowingly killed his wife. We will not second-guess the jury's decision because there is sufficient evidence to sustain the verdict.

Much of the evidence presented at trial indicated that the victim's death was the result of a homicide rather than a suicide. Brown, McKey, Powell, and Loudermilk testified that the victim was very excited about her son's wedding, was planning on attending the ceremony in Florida, and had been shopping for a dress to wear. Brown testified that the victim did not appear depressed shortly before her death. McKey stated that the victim had told her that Owens had been unfaithful on more than once occasion and that she had decided to confront Owens about his most recent infidelity the Friday before her death. Powell stated that the victim was unhappy about the fact that Owens currently had a girlfriend but that Owens had been unfaithful several times in the past and the victim had never talked about committing suicide. She also stated that the victim intended to confront Owens about his infidelity the weekend of her death. Loudermilk stated that her mother had never mentioned suicide to her. She asserted that although her mother had been treated by an orthopedist for arthritis and joint problems, the pain associated with these conditions was not enough to keep her mother from doing her daily activities and working at her job.

Moreover, although the results from Owens's gunshot residue test were not processed because the kit used did not meet TBI protocols, Officer Daniels and paramedic Ronald Butrum testified that they witnessed Owens repeatedly washing his hands, and Agent Hodge testified that a person could remove gunshot residue by washing his hands. Carol Wright, the human resources director at the victim's company, testified that approximately one week after the victim's death, Owens asked her if the victim had a life insurance policy and inquired about the amount of the policy and the beneficiary of the policy. She stated that he

-30-

received $62,000 from the victim's life insurance policy and all of the funds in the victim's 401(k). Loudermilk testified that Owens was the only person to receive any money from the victim's bank accounts, life insurance, and 401(k) accounts after the victim's death.

The medical evidence also indicated that suicide was unlikely. Although Dr. Li testified that he could not conclusively determine the victim's manner of death, he stated that gunshot wounds in suicides are typically on the forehead, the temple, or sometimes inside the mouth and that wounds on other parts of the head were "very rarely" seen in suicides. He also stated that the victim's wounds in this case were unusual because of the location of the wounds and the direction of the bullet path. Finally, Dr. Li opined that the weapon found at the scene, which was heavy, would have been difficult for the victim to hold to produce the type of injury she suffered.

Furthermore, the revolver provided strong evidence that the victim's death was a homicide. Agent Scott, Detective Hardy, and Officer Daniels all testified that the spent cartridge would have been underneath the hammer of the revolver if the victim had fired a single, self-inflicted gunshot. Although Owens presented the theory that the improper handling of the revolver at the crime scene affected the position of the fired cartridge, it was the jury's duty to evaluate the credibility of witnesses, to determine the weight given to testimony, and to resolve all conflicts in the evidence. See Odom, 928 S.W.2d at 23. For this reason, we will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Based on this evidence, a reasonable jury could have concluded that Owens knowingly killed the victim with his .357 revolver. Therefore, we conclude that the proof is sufficient to sustain Owens's conviction for second degree murder.

**VI. <u>Cumulative Error.</u>** Owens argues that the cumulative effect of the trial court's errors resulted in an unfair trial. Specifically, he claims that Holder's testimony regarding his alleged threat to the victim, the repetition of Holder's testimony, the admission of the victim's hearsay statements, the testimony of witnesses who observed bruising on the victim, and the State's questioning of Loudermilk on redirect examination prejudiced him and prevented him from receiving a fair trial. Because we have already determined that Owens is not entitled to relief on any of his issues on appeal, we need not consider the cumulative effect of the alleged errors. State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.").

**VII. <u>Sentencing.</u>** Owens argues that the trial court imposed an excessive sentence. He asserts that the trial court failed to give sufficient weight to the mitigating factor regarding his severe health problems because it declined to read all of his medical proof. He also claims that his sentence is excessive because his twenty-year sentence could result in

him dying in prison, given his age. Moreover, Owens argues that in sentencing him to a twenty-year sentence on the basis of the enhancement factor that he possessed a firearm during the commission of the crime, the trial court failed to impose the least severe sentence necessary to achieve the purpose for the sentence. See T.C.A. § 40-35-103(4). Furthermore, he claims that the trial court failed to consider his potential for rehabilitation and failed to recognize that a lesser sentence would have sufficiently deterred him and other wrongdoers. See id. § 40-35-103(5).

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's sentence:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Comments.

Because of the broad discretion given to trial courts by the 2005 amendments to the sentencing act, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The transcript from the sentencing hearing shows that prior to imposing the sentence, the court noted that "the main element of deciding . . . the punishment and the purposes is to provide an effective, general deterrent to those likely to violate the criminal laws of the State." See T.C.A. § 40-35-102(3)(A). The court also noted that "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense[.]" See id. § 40-35-102(1).

The record shows that the trial court reviewed several mitigation letters that discussed Owens's medical problems. When Owens offered a computer disk containing 477 pages of medical records detailing his medical history over the last several decades, the court stated:

> I'm not going to read the medical proof. I mean, I think it is pretty clear, he has had heart surgeries. He's diabetic and that type of thing. And I heard that at trial, and I heard it today, and I see it in these letters too. So, I'm not going to go through all the medical [records].

> Although, I will take notice that based on what you said he has some significant medical conditions.

The court stated that because he had been convicted of second degree murder, Owens faced a sentence of fifteen to twenty-five years with a release eligibility of one hundred percent. Id. §§ 40-35-112(a)(1), -501(i)(1), -501(i)(2)(B).

Although the trial court applied the mitigating factor regarding Owens's poor health, it stated that it was not going to "give great weight to that, especially when the only thing that this Court will decide is the length of the sentence." Id. §40-35-113(13). The court applied the enhancement factor (1) that Owens had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" because of a prior DUI conviction. Id. § 40-35-114(1). However, the court noted that this enhancement factor was "a very minor factor to the Court." The court also applied enhancement factor (9), that "[t]he defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense," because it found that the possession of the handgun was "an important factor in this case." The court held that enhancement factor (1) and mitigating factor (13) "offset each other" because they were "both minor," which left the court to consider the impact of enhancement factor (9) on the sentence. At the conclusion of the hearing, the trial court sentenced Owens as a Range I, standard offender to twenty years at one hundred percent release eligibility.

We conclude that the trial court did not impose an excessive sentence in this case. The trial court properly relied on the proof at trial and on defense counsel's statements and the letters from Owens's family and girlfriend, which provided an overview of his medical problems. The record establishes that the court was adequately informed of the nature and severity of Owens's health problems prior to imposing a sentence in this case. Moreover, the court found that this mitigating factor was not entitled to much weight. The record also shows that the court was aware of Owens's age at the time of sentencing.

At the conclusion of the hearing, the court sentenced Owens to twenty years, five years less than the maximum sentence in the range for a conviction for second degree

murder. Because the trial court imposed a sentence within the appropriate range, considered the purposes and principles of the sentencing act, and considered the appropriate enhancement and mitigating factors, we uphold Owens's sentence of twenty years.  See Bise, 380 S.W.3d at 706-07.  The trial court's judgment is affirmed.

## CONCLUSION

Upon review, the judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE